# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 16, 2009**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.   10-174** |
| | : | |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| | : | **18 U.S.C. § 371** |
| **HOSSEIN A. LARIJANI;** | : | **(Conspiracy)** |
| **WONG YUH LAN (a/k/a "Jancy** | : | |
| **Wong");** | : | **18 U.S.C. § 554** |
| **PAYA ELECTRONICS COMPLEX;** | : | **(Smuggling)** |
| **OPTO ELECTRONICS PTE, LTD.;** | : | |
| **LIM YONG NAM (a/k/a "Steven Lim");** | : | **50 U.S.C. § 1705** |
| **NEL ELECTRONICS PTE, LTD.;** | : | **(International Emergency Economic** |
| **LIM KOW SENG (a/k/a "Eric Lim,"** | : | **Powers Act)** |
| **a/k/a "James Wong");** | : | |
| **HIA SOO GAN BENSON (a/k/a "Benson** | : | **22 U.S.C § 2778** |
| **Hia," a/k/a "Thomas Yan"); and** | : | **(Arms Export Control Act)** |
| **COREZING INTERNATIONAL PTE,** | : | |
| **LTD.,** | : | **22 C.F.R. Part 120** |
| | : | **(International Traffic in Arms** |
| | : | **Regulations)** |
| | : | |
| **Defendants.** | : | **31 C.F.R. Part 560** |
| | : | **(Iranian Transactions Regulations)** |
| | : | |
| | : | **18 U.S.C. § 1001** |
| | : | **(False Statements)** |
| | : | |
| | : | **18 U.S.C. § 1512** |
| | : | **(Obstruction of Justice)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting, and Causing** |
| | : | **an Act to be Done)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(C) and** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | **(Criminal Forfeiture)** |

**SUPERSEDING INDICTMENT**

The Grand Jury charges that:

**COUNT ONE**
**(Conspiracy to Defraud the United**
**States by Dishonest Means)**

At all times material herein:

A.    **Background**

1.      Defendant PAYA ELECTRONICS COMPLEX ("PAYA ELECTRONICS"), also

known as "Paya Complex," was a company that operated in Iran at the address of No. 3 Mirza

Kochak Ave., Jomhori Street, Tehran, Iran.

2.      Defendant OPTO ELECTRONICS PTE, LTD. ("OPTO ELECTRONICS") was a

company that operated in Singapore.

3.      Defendant HOSSEIN A. LARIJANI ("LARIJANI") was a citizen of Iran.

LARIJANI was an owner and director of PAYA ELECTRONICS with authority to bind the

company who procured U.S.-origin items for PAYA ELECTRONICS for shipment to Iran.

LARIJANI was also an owner and director of OPTO ELECTRONICS with authority to bind the

company.

4.      Defendant WONG YUH LAN ("WONG"), also known as "Jancy Wong," was a

citizen of Singapore.  WONG was an agent of OPTO ELECTRONICS who worked in Singapore

and was supervised by LARIJANI from Iran.

5.      Defendant NEL ELECTRONICS, PTE, LTD. ("NEL ELECTRONICS") was a

company that operated in Singapore.

6.      Defendant LIM YONG NAM ("NAM"), also known as "Steven Lim," was a

citizen of Singapore.  NAM was an owner and director of NEL ELECTRONICS.

7.      Defendant COREZING INTERNATIONAL PTE LTD. ("COREZING") was a company that was based in Singapore at the addresses of 2021 Butik Batok Street 23, #02-212, Singapore 659626; 111 North Bridge Road, #27-01 Peninsula Plaza, Singapore 179098; 50 East Coast Road, #2-70 Roxy Square, Singapore 428769; Block 1057 Eunos, Avenue 3 #02-85, Singapore 409848; and Thompson Road Post Office, PO Box 266, Singapore.  COREZING also maintained addresses in Hong Kong located at G/F, No. 89, Fuyan Street, Kwun Tong, Hong Kong; Flat 12, 9F Po Hong Kong, 2 Wang Tung Street, Kowloon Bay, Hong Kong; Flat/RM 2309, 23/F, Ho King COMM Center 2-16 Fa Yuen Street, Mongkok KLN, Hong Kong. COREZING also maintained addresses in the People's Republic of China at Room 1007, Block C2, Galaxy Century Bldg., CaiTian Rd., FuTian District, Shenzhen, China; and Room 1702, Tower B, Honesty Building, Humen, Dongguan, Guangdong, China.

8.      Defendant LIM KOW SENG ("SENG"), also known as "Eric Lim," and also known as "James Wong," was a citizen of Singapore.  SENG was an agent of Company D and COREZING.

9.      Defendant HIA SOO GAN BENSON ("HIA"), also known as "Benson Hia," and also known as "Thomas Yan," was a citizen of Singapore.  HIA was a manager, director, and agent of COREZING.

10.      Improvised explosive devices ("IEDs"), also known as "roadside bombs," caused approximately 60 percent of all American combat casualties in Iraq between the years 2001 and 2007.  IEDs were the number one threat to American troops in Iraq.

11.      Company A was based in the State of Minnesota and was a manufacturer of,

among other things, radio frequency modules (hereinafter "modules") that have a wide range of applications and uses.  Company A's modules include encryption capabilities and have a particularly long range that allows them to transmit data wirelessly across distances as great as 40 miles when configured with a high-gain antenna.  In addition to commercial uses, these same modules have other lethal and destructive applications.  Notably, during 2008 and 2009, United States and Coalition armed forces recovered numerous modules manufactured by Company A in Iraq where they had been utilized as part of the remote detonation system for IEDs.

**B.     Export and Shipping Records**

12.     Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States.  Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection, which was headquartered in the District of Columbia.  A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States.  These forms were used by the United States Bureau of Census to collect trade statistics and by the Bureau of Industry and Security ("BIS"), Department of Commerce, which was located in the District of Columbia, for export control purposes.

13.     Bureau of Industry and Security Form 711 ("BIS Form 711") was submitted to the United States Department of Commerce by exporters, shippers, or freight forwarders that required the identification of the end-user and end-use of U.S.-origin goods being exported from

4

the United States.  BIS Form 711 specifically advises exporters that the provision of false

information on the forms can subject the exporters to possible criminal penalties.  Every BIS

Form 711 included the following cautionary language which must be adopted by the exporter,

shipper, or freight forwarder who prepared and signed the form:

> We certify that all of the facts contained in this statement are true
> and correct to the best of our knowledge and we do not know of
> any additional facts which are inconsistent with the above
> statement.  We shall promptly send a supplemental statement to the
> U.S. Exporter, disclosing any change of facts or intentions set forth
> in this statement which occurs after the statement has been
> prepared and forwarded . . . .

> We acknowledge that the making of any false statements or
> concealment of any material fact in connection with this statement
> may result in imprisonment or fine, or both and denial, in whole or
> in part, of participation in U.S. exports and imports.

14.    A material part of these export filings was information concerning the end-user or

ultimate destination of the export.  The identity of the end-user may determine whether the goods

may be exported without any specific authorization from the United States government; whether

the goods may be exported with a specific authorization or license from the United States

Department of Commerce, the United States Department of State, or the United States

Department of Treasury; or whether the goods may not be exported from the United States under

any circumstances.

15.    Statements made on these export filings were statements to the United States

government that the transaction occurred as described.  Other United States government agencies

located in the District of Columbia and elsewhere also relied upon the information provided in

BIS Form 711s, SEDs, and AES records.

5

C.      **The Iranian Transactions Regulations**

16.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic restrictions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

17.     On March 15, 1995, President William Jefferson Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959 and 13059, was in effect at all times relevant to this Indictment.  President George W. Bush continued and maintained the restrictions instituted against Iran by President Clinton.

18.     Executive Order Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, "Executive Orders") imposed economic restrictions on Iran.  The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

19.     The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the

promulgation of rules and regulations, as may be necessary to carry out the purposes" of the

Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the

Iranian Transactions Regulations  ("ITR"), 31 C.F.R. Part 560, implementing the restrictions

imposed by the Executive Orders.

20.     The ITR prohibited, among other things, the export, reexport, sale, or supply,

directly or indirectly, of any goods, technology, or services from the United States or by a United

States person, wherever located, to Iran or the Government of Iran, without prior authorization or

license from the United States Department of the Treasury, through the Office of Foreign Assets

Control, located in the District of Columbia.  These regulations further prohibited any

transactions that evaded or avoided or had the purpose of evading or avoiding any of the

prohibitions contained in the ITR, including the unauthorized exportation of goods from the

United States to a third country if the goods were intended or destined for Iran.

21.     The Executive Orders and the ITR were in effect at all times relevant to this

Indictment.

**D.     Venue**

22.     The conduct alleged in this Count began outside of the jurisdiction of any

particular State or district and later occurred within the District of Columbia and elsewhere and is

therefore within the venue of the United States District Court for the District of Columbia, as

provided by 18 U.S.C. §§ 3237(a) and 3238.

**E.     The Conspiracy**

23.     From in or about June 2007 through in or about February 2008, defendants

LARIJANI, WONG, PAYA ELECTRONICS, OPTO ELECTRONICS, NAM, NEL

ELECTRONICS, SENG, HIA, and COREZING did knowingly and willfully conspire, combine,

confederate, and agree together and with others known and unknown to the Grand Jury, to

defraud the United States by impeding, impairing, obstructing, and defeating the lawful function

of the United States in administering its export laws and regulations by exporting approximately

6,000 modules from Company A in the State of Minnesota by deceit, craft, trickery, and

dishonest means.

**F.      The Object of the Conspiracy**

24.      The object of the conspiracy was for the co-conspirators to obtain money and

property by exporting and causing to be exported modules from Company A in violation of

United States law.

**G.      Manner and Means of the Conspiracy**

25.      The conspirators would and did use the following manner and means, among

others, to accomplish the object of the conspiracy.

A.      It was a part of the conspiracy that defendants LARIJANI, WONG, PAYA

ELECTRONICS, OPTO ELECTRONICS, NAM, NEL ELECTRONICS, SENG, HIA, and

COREZING, structured themselves as an organized criminal group in the following ways:

(i)      LARIJANI in Iran was the purchaser of the modules who directed

that one of his employees, WONG, purchase the modules.

(ii)      Because WONG was unable to purchase the modules directly

herself from the United States, NAM of NEL ELECTRONICS purchased the modules for

8

WONG from the United States.

(iii)    NAM of NEL ELECTRONICS directed COREZING, SENG, and HIA to purchase the modules from the United States on behalf of NAM.  COREZING, SENG, and HIA served as a buffer between NAM and Company A, so that Company A would never learn that NAM and NEL ELECTRONICS were working to procure the modules for LARIJANI, WONG, PAYA ELECTRONICS, and OPTO ELECTRONICS.

(iv)    COREZING, SENG, and HIA had responsibility for procuring the modules from Company A in the United States and exporting the modules to Singapore.

(v)    COREZING, SENG, and HIA obtained the modules from the United States on behalf of NAM and had them delivered to their freight forwarder in Singapore.

(vi)    NAM and NEL ELECTRONICS arranged with WONG and OPTO ELECTRONICS to have the items transferred from COREZING's freight forwarder to Iran through third countries.

(vii)    Once NAM and NEL ELECTRONICS obtained the modules in Singapore, NAM and NEL ELECTRONICS transferred the modules to WONG, OPTO ELECTRONICS, LARIJANI, and PAYA ELECTRONICS.

(viii)    Because Company A exported its modules using Federal Express, LARIJANI, WONG, and NAM obtained tracking numbers for certain shipments of modules to COREZING and tracked the shipments from the United States to Singapore.

B.    It was a part of the conspiracy that defendants LARIJANI, WONG, PAYA ELECTRONICS, OPTO ELECTRONICS, NAM, NEL ELECTRONICS, SENG, HIA, and COREZING obtained money and goods through false pretenses and received money and property

knowing that the property had been unlawfully obtained through such false pretenses.

(i)     NAM, NEL ELECTRONICS, SENG, HIA, and COREZING made misrepresentations and false statements to Company A in order to convince Company A through false pretenses to sell 6,000 modules to COREZING and to convince Company A to export the modules to Singapore.

(ii)    LARIJANI, WONG, PAYA ELECTRONICS, NAM, and NEL ELECTRONICS engaged in acts of dishonesty, deceit, and false pretenses intended to obtain money and property by exporting Company A's modules from the United States to Iran through Singapore with knowledge that the export of U.S.-origin goods to Iran was a violation of United States law and that Company A's modules were manufactured in the United States.

(iii)   LARIJANI, WONG, PAYA ELECTRONICS, and OPTO ELECTRONICS received valuable property in the form of Company A's modules knowing that the modules had been unlawfully obtained in violation of United States law.

(iv)    NAM and NEL ELECTRONICS received money for transshipping Company A's modules to Iran knowing that the modules had been unlawfully obtained by defendants without a license from the United States government for export, direct or indirect, to Iran.

C.      It was further a part of the conspiracy that defendants LARIJANI, WONG, PAYA ELECTRONICS, OPTO ELECTRONICS, NAM, NEL ELECTRONICS, SENG, HIA, and COREZING acted across international borders by conducting and causing to be conducted international shipments of goods and services, including the international shipment of the modules and the international transfer of monetary payments.

10

**H.**     **Overt Acts in Furtherance of the Conspiracy**

26.     Beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia, and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the object thereof, defendants LARIJANI, WONG, PAYA ELECTRONICS, OPTO ELECTRONICS, NAM, NEL ELECTRONICS, SENG, HIA, and COREZING and others known and unknown to the Grand Jury, committed the following overt acts and caused them to be committed, among others:

**The Initial Contacts with Company A**

(1)     On or about June 20, 2007, defendant WONG, while working in Singapore as an employee of defendant OPTO ELECTRONICS, contacted Company A directly and asked for a price quotation on the purchase of 6,000 modules; Company A responded with a price of 98.45 United States dollars ("USD$") per module.

(2)     On or about June 20, 2007, defendant WONG in Singapore contacted defendant LARIJANI in Iran and advised LARIJANI that 6,000 modules could be purchased from Company A at a price of USD $98.45 per module.

(3)     On or about June 20, 2007, defendant WONG in Singapore requested that Company A sell the 6,000 modules to WONG at a price of USD $60.00 per module, in response to which Company A asked WONG to provide end-use and end-user information.

(4)     On or about June 21, 2007, defendant WONG in Singapore advised Company A that the 6,000 modules WONG wanted to purchase were intended for "a local customer in Singapore."

(5)     On or about July 4, 2007, Company A advised defendant WONG in Singapore that the best price that Company A could give to WONG was USD $93.50 unless WONG provided more details about the end-use and the end-user for the modules.

(6)     On or about July 11, 2007, defendant WONG in Singapore contacted defendants NAM and NEL ELECTRONICS in Singapore and asked that NEL ELECTRONICS "please take over this order" to purchase 6,000 modules from Company A.

(7)     Between on or about July 11, 2007, and on or about July 16, 2007, defendant NEL ELECTRONICS in Singapore requested that defendant COREZING in Singapore initiate contact with Company A and negotiate the deal with Company A.

(8)     On or about July 16, 2007, defendant SENG, while working in Singapore for defendant COREZING, initiated contact with Company A about purchasing 6,000 modules, which were to be exported from the United States.

(9)     In or about August 2007, defendant COREZING in Singapore and Company A negotiated an agreement in which Company A agreed to sell 6,000 modules to COREZING at a price of USD $69.30 per module.  These modules were to be exported to Singapore in several shipments.

(10)     In or about August 2007, defendant COREZING in Singapore discussed with defendants NAM and NEL ELECTRONICS in Singapore the purchase of the 6,000 modules from Company A for NEL ELECTRONICS at a price to NEL ELECTRONICS of USD $77 per module.

(11)     On or about August 6, 2007, defendant LARIJANI in Iran communicated with defendant NAM of defendant NEL ELECTRONICS in Singapore, asking about the status of

the module order from Company A.

(12)    On or about August 7, 2007, defendant NAM in Singapore forwarded a purchase order to defendant LARIJANI in Iran regarding modules manufactured by Company A, noting that the 6,000 pieces would be shipped in five separate orders from the United States.  The purchase order stated that the total value of the order was USD $510,000, or USD $85 per module.

(13)    On or about August 16, 2007, defendant COREZING in Singapore wired approximately USD $14,000 to Company A's bank account in the United States as a deposit on the 6,000 module order.

### The First Export of 700 Modules from the United States to Iran Through Singapore and Malaysia

(14)    On or about August 23, 2007, defendant COREZING in Singapore wired approximately USD $48,510 to Company A from COREZING's bank account in Singapore to Company A's bank in the United States as payment for the first shipment of modules.

(15)    On or about August 20, 2007, before any of Company A's modules had even been exported from the United States, defendant NEL ELECTRONICS in Singapore sought payment from defendant OPTO ELECTRONICS in Singapore for the sale of 700 modules at a cost of USD $59,500, requesting that payment be made by defendant WONG on behalf of OPTO ELECTRONICS.

(16)    On or about August 24, 2007, defendant COREZING in Singapore caused the first shipment of 700 modules to be shipped from Company A in the United States.

(17)    On or about August 24, 2007, defendant COREZING in Singapore caused

13

Company A to generate an invoice to COREZING for the purchase of 700 modules for a total

cost of USD $48,150. Company A's invoice noted that the modules were of "USA origin," that

they were exported from the United States "[f]or ultimate destination of Singapore," and that any

diversion from Singapore was "contrary to U.S. law."

(18)    On or about August 25, 2007, defendant COREZING in Singapore sought

payment from defendant NEL in Singapore for the 700 modules in the amount of USD $53,900,

with a communication which included reference to the modules' place of origin as "USA."

(19)    On or about August 25, 2007, defendants COREZING, NAM, and NEL

ELECTRONICS in Singapore and others known to the Grand Jury caused Company A to submit

an SED to the United States Department of Commerce, headquartered in the District of

Columbia, that falsely stated on the SED that the country of ultimate destination of the first

shipment of 700 modules was Singapore.

(20)    On or about August 27, 2007, defendant COREZING in Singapore

informed its freight forwarder that defendant NAM or an associate of defendant NEL

ELECTRONICS or someone from NEL ELECTRONICS' associate company would pick up the

first shipment of 700 modules.

(21)    On or about August 27, 2007, an employee of defendant NEL

ELECTRONICS in Singapore contacted defendants WONG, NAM, and LARIJANI in Singapore

and Iran respectively to inform them that the 700 modules would arrive in Singapore the

following day.

(22)    On or about August 28, 2007, defendant WONG with OPTO

ELECTRONICS in Singapore prepared and sent a sales invoice to a freight forwarder in Tehran,

14

Iran, for the shipment of 29 cartons of goods, including a carton containing the 700 modules for a price of 99,470 Singapore dollars ("S$").

(23)     On or about August 28, 2007, defendant WONG in Singapore advised the freight forwarder to make sure that the first 700 modules had arrived in Singapore.

(24)     On or about September 2, 2007, defendants OPTO ELECTRONICS and NEL ELECTRONICS in Singapore sent 29 containers of goods, including the 700 modules, from Singapore for ultimate delivery to Iran through a freight consolidator used by defendant LARIJANI in Tehran, Iran.  The shipment was to be delivered via Singapore Air Flight SQ106 to Kuala Lumpur, Malaysia, on or about September 2, 2007, and then via Iran Air Flight IR841 from Kuala Lumpur, Malaysia, to Tehran, Iran, on or about September 3, 2007.

(25)     On or about September 11, 2007, defendant LARIJANI in Iran communicated with defendant NAM in Singapore and stated that he had only received 679 modules rather than the agreed upon 700.

### The Second Export of 1,300 Modules from the United States to Iran Through Singapore and Thailand

(26)     On or about August 30, 2007, defendant NEL ELECTRONICS in Singapore communicated with defendant WONG and defendant OPTO ELECTRONICS in Singapore to pass along the charges for payment for the 1,300 modules at a total cost of USD $110,500.

(27)     On or about September 5, 2007, defendant COREZING in Singapore wired USD $90,090 to Company A from COREZING's bank in Singapore to Company A's bank in the United States as payment for the second shipment of modules.

15

(28)     On or about September 6, 2007, defendant SENG met with an employee of Company A in Singapore and represented that the 6,000 modules being purchased by COREZING were for a customer in the Philippines and for use in a wireless broadband modem application.

(29)     On or about September 10, 2007, defendant NAM in Singapore contacted defendant LARIJANI in Iran to explain that defendant NEL ELECTRONICS in Singapore had made payment on this second shipment of 1,300 modules "to the USA supplier" and requested that LARIJANI prepare to make payment for the third shipment.

(30)     On or about September 11, 2007, defendant COREZING in Singapore caused Company A to generate a commercial invoice to COREZING for the sale of 1,300 modules at a total cost of USD $90,090; Company A's invoice noted that the modules were of "USA origin," that they were "exported from the United States," that the "ultimate destination [was] Singapore," and that any diversion from Singapore was "contrary to U.S. law."

(31)     On or about September 12, 2007, defendant COREZING in Singapore and others known to the Grand Jury caused Company A to submit an SED to the United States Department of Commerce, which is headquartered in the District of Columbia, for the export of the 1,300 modules to COREZING, falsely stating on the SED that the country of ultimate destination was Singapore.

(32)     On or about September 12, 2007, defendant COREZING in Singapore caused Company A to export 1,300 modules to COREZING in Singapore.

(33)     On or about September 14, 2007, defendant NEL ELECTRONICS in Singapore generated a delivery order to defendant OPTO ELECTRONICS in Singapore to the

16

attention of defendant WONG in Singapore for five cartons containing 1,300 modules.

(34)    On or about September 17, 2007, defendant OPTO ELECTRONICS in Singapore invoiced a freight forwarder used by defendant LARIJANI in Tehran, Iran, for 34 cartons of goods, including five cartons containing 1,300 modules purchased from Company A, at a cost to OPTO ELECTRONICS of USD $184,795.

(35)    On or about September 17, 2007, defendant NAM in Singapore communicated with defendants WONG and LARIJANI in Singapore and Iran, respectively, regarding the incoming shipment of 1,300 modules which NAM promised to arrange for immediate shipment to the freight forwarder for defendant OPTO ELECTRONICS.

(36)    On or about September 19, 2007, defendant OPTO ELECTRONICS in Singapore sent five cartons of goods containing 1,300 of Company A's modules from Singapore to a freight forwarder used by defendant LARIJANI in Tehran, Iran, through Bangkok, Thailand, on Thai Airways Flight TG 402.

(37)    On or about September 30, 2007, defendant LARIJANI in Iran communicated with defendant NAM in Singapore advising NAM that LARIJANI had only received 1,298 modules – not the 1,300 modules expected in this second shipment.

### The Third Export of 2,000 Modules from the United States to Iran Through Singapore and Thailand

(38)    On or about October 8, 2007, defendant NAM in Singapore communicated with defendants SENG and HIA in Singapore asking that defendant COREZING in Singapore confirm a delivery date from the United States for the third shipment and asking for any information regarding the shortages in the first and second shipments.

17

(39)     On or about October 23, 2007, defendant COREZING in Singapore

transferred USD $138,600 from COREZING's bank account in Singapore to Company A's bank

account in the United States as payment for the next anticipated shipment of modules.

(40)     On or about October 25, 2007, defendant NAM in Singapore provided

defendant LARIJANI in Iran a news article discussing efforts by the United States government to

"crack down on companies believed to be smuggling equipment to Iran to build explosive

devices killing American soldiers in Iraq and Afghanistan."

(41)     On or about October 26, 2007, defendant COREZING in Singapore

caused Company A to invoice COREZING for the sale of 2,000 modules in the amount of USD

$138,758; Company A's invoice noted that the modules were of "USA origin," that the modules

were "exported from the United States," that the ultimate destination was Singapore, and that

diversion of modules from Singapore was "contrary to U.S. law."

(42)     On or about October 26, 2007, defendant COREZING in Singapore caused

Company A to export 2,000 modules to COREZING via Federal Express with tracking number

945281313578.  This shipment included modules with serial numbers 3791F370 and

3791F510, which were recovered in Iraq during December 2008 as components of IEDs;  serial

numbers 3791F328, 3791F1C8, 37916BF9, 2790BF44, 77917BF4, 57510429, 779184FD,

779186F7, 3791E3EF, 779187B1, 7791909A, and 77919336, which were recovered in Iraq

during April 2009 as components of IEDs; and serial number 37920EAA, which was recovered

in Iraq during July 2010 as a component of an IED.

(43)     On or about October 26, 2007, defendant COREZING in Singapore caused

Company A to submit an SED to the United States Department of Commerce, which is

headquartered in the District of Columbia, for the export of 2,000 modules, falsely declaring that the country of ultimate destination was Singapore, but this shipment was detained by the United States Department of Commerce on or about October 29, 2007.

(44)   On or about October 30, 2007, defendant COREZING in Singapore communicated with defendant NEL ELECTRONICS in Singapore to obtain payment for the 2,000 modules in the amount of USD $154,000.

(45)   On or about November 9, 2007, defendant SENG in Singapore, acting on behalf of defendant COREZING, contacted Federal Express to request the release of the 2,000 modules which had been seized in transit by the United States government on October 29, 2007.

(46)   On or about November 10, 2007, defendant LARIJANI in Iran communicated with defendant NAM to obtain the Federal Express tracking number for this third shipment of modules.

(47)   On or about November 10, 2007, defendant NAM in Singapore provided defendant LARIJANI in Iran with Federal Express tracking number 945281313578 for the third shipment of Company A's modules.

(48)   On or about November 17, 2007, defendant COREZING in Singapore, having received a BIS Form 711 from Company A requesting that COREZING provide end-user and end-use statements for this third shipment, forwarded the BIS Form 711 to defendant NAM at defendant NEL ELECTRONICS in Singapore.

(49)   On or about November 19, 2007, defendant SENG in Singapore told Company A that defendant COREZING in Singapore would not complete the BIS Form 711, claiming that a non-disclosure agreement prohibited COREZING from revealing its customer or

the end-use.

(50)     On or about November 21, 2007, defendant COREZING in Singapore executed a non-disclosure agreement with a representative of Company A.  This non-disclosure agreement included a provision requiring that the signatories "adhere to all applicable laws and regulations of the U.S. Export Administration and . . .  not export or re-export any technical data or products received from a disclosing Party to any proscribed person or country listed in the U.S. Export Administration regulations unless properly authorized by the U.S. Government."

(51)     On or about November 22, 2007, defendant COREZING in Singapore forwarded to Company A a BIS Form 711 completed and purportedly signed by COREZING and defendant NEL ELECTRONICS in Singapore that falsely stated that the ultimate consignee on the transaction was NEL ELECTRONICS in Singapore, that NEL ELECTRONICS was a manufacturer, that the modules were for use in a "telecom project" in Singapore, and that NEL ELECTRONICS would not resell or re-export the product without authorization from the United States government.

(52)     On or about November 22, 2007, defendant HIA, while working in Singapore for defendant COREZING, contacted Company A and asked for the 2,000 modules to be released from detention as soon as possible and to expedite the shipment.

(53)     On or about November 28, 2007, defendants COREZING and NEL ELECTRONICS in Singapore caused Company A to obtain the release of the shipment of 2,000 modules from the United States government based on the false end-user and end-use information that COREZING and NEL ELECTRONICS had provided to Company A in the BIS Form 711, claiming that the modules were for use in a telecommunications project in Singapore.

(54)     On or about December 3, 2007, defendant NEL ELECTRONICS in Singapore communicated with defendant OPTO ELECTRONICS in Singapore to obtain payment for the 2,000 modules in the amount of USD $170,000.

(55)     On or about December 3, 2007, defendant OPTO ELECTRONICS in Singapore invoiced a freight forwarder associated with defendant LARIJANI in Tehran, Iran, for the shipment of 20 cartons to Iran, including the 2,000 modules, valued at S$271,200 on Mahan Air.

(56)     On or about December 5, 2007, defendant OPTO ELECTRONICS in Singapore shipped the 2,000 modules to Iran through a freight forwarder associated with defendant LARIJANI in Tehran, Iran, from Singapore through Bangkok, Thailand, on Thai Airways Flight 404.

## The Fourth Export of 500 Modules from the
## United States to Iran Through Singapore and Malaysia

(57)     On or about January 11, 2008, defendant COREZING in Singapore forwarded to Company A a BIS Form 711 completed and purportedly signed by COREZING and NEL ELECTRONICS in Singapore that falsely stated that the ultimate consignee on the fourth shipment of 500 modules was defendant NEL ELECTRONICS in Singapore, that NEL ELECTRONICS was a manufacturer, that the modules were for use in a "telecom project" in Singapore, and that NEL ELECTRONICS would not resell or re-export the product without authorization from the United States government.

(58)     On or about January 11, 2008, defendant COREZING in Singapore transferred USD $34,650 from COREZING's bank account in Singapore to Company A's bank

account in the United States as partial payment for the next shipment of 500 modules.

(59)    On or about January 12, 2008, defendant HIA in Singapore communicated to defendants NAM, NEL ELECTRONICS, and SENG that NAM should check with NAM's "customer" regarding the module order.

(60)    On or about January 14, 2008, defendant COREZING in Singapore caused Company A to invoice COREZING for the sale of 500 modules at a cost of approximately USD $34,751.46; Company A's invoice noted that the goods were of "USA origin," that the modules were exported from the United States, that their ultimate destination was Singapore, and that diversion from Singapore was "contrary to U.S. law."

(61)    On or about January 14, 2008, defendant COREZING in Singapore caused Company A to export 500 modules to COREZING in Singapore via Federal Express with tracking number 945281337016.  This shipment included a module with serial number 579000DD, which was recovered in Iraq in May 2008 as a component of an IED.

(62)    On or about January 15, 2008, defendants COREZING, NAM, and NEL ELECTRONICS in Singapore caused Company A to submit an SED to the United States Department of Commerce, which is headquartered in the District of Columbia, for the export of 500 modules, falsely stating that the country of ultimate destination for the modules was Singapore.

(63)    On or about January 15, 2008, defendant OPTO ELECTRONICS in Singapore arranged with a freight forwarder associated with defendant LARIJANI in Tehran, Iran, for the shipment of fifteen cartons, including 500 modules valued at USD $67,790.

(64)    On or about January 21, 2008, defendant OPTO ELECTRONICS in

Singapore shipped at least fourteen cartons of goods, including the 500 modules, to Iran through

Kuala Lumpur, Malaysia, and then on to Tehran, Iran, via Iran Air Flight 841.

### The Fifth Export of 1,500 Modules from the United States to Iran Through Singapore and Thailand

(65)    On or about February 2, 2008, defendant COREZING in Singapore

forwarded to Company A a BIS Form 711 completed and purportedly signed by COREZING and

defendant NEL ELECTRONICS in Singapore that falsely stated that the ultimate consignee for

the final shipment of 1,500 modules was NEL ELECTRONICS, that NEL ELECTRONICS was

a manufacturer, that the modules were for use in a "telecom project" in Singapore, and that NEL

ELECTRONICS in Singapore would not resell or re-export the product without authorization

from the United States government.

(66)    On or about February 4, 2008, defendant COREZING in Singapore

transferred USD $91,955 from its bank account in Singapore to Company A's bank account in

the United States as partial payment for the next shipment of modules.

(67)    On or about February 4, 2008, defendant NAM in Singapore

communicated with defendant LARIJANI in Iran, alerting LARIJANI that a permanent resident

of Singapore had recently been arrested in the United States for exporting U.S.- origin goods to

Iran in violation of United States law.

(68)    On or about February 5, 2008, defendant COREZING in Singapore caused

Company A to invoice COREZING for the sale of 1,500 modules at a cost of approximately

USD $104,156.38; Company A's invoice noted that the goods were of "USA origin," that the

modules were exported from the United States, that their ultimate destination was Singapore, and

that diversion from Singapore was "contrary to U.S. law."

(69)     On or about February 5, 2008, defendant COREZING in Singapore caused Company A to ship 1,500 modules from the United States to COREZING in Singapore via Federal Express with tracking number 945281344728.

(70)     On or about February 6, 2008, defendants COREZING, NAM, and NEL ELECTRONICS in Singapore caused Company A to submit an SED for the shipment of the 1,500 modules to the United States Department of Commerce, which is headquartered in the District of Columbia, falsely stating on the SED that the country of ultimate destination was Singapore.

(71)     On or about February 7, 2008, defendant NAM in Singapore communicated with defendant LARIJANI in Iran, advising LARIJANI that the tracking number for the shipment of 1,500 modules from Company A to COREZING in Singapore was 945281344728.  In that same communication, NAM also provided the tracking history to LARIJANI showing that the 1,500 modules had left the United States.

(72)     On or about February 11, 2008, defendant NEL ELECTRONICS in Singapore arranged for payment from defendant OPTO ELECTRONICS in Singapore for 1,500 modules at a total cost of USD $127,500.

(73)     On or about February 11, 2008, defendant WONG in Singapore instructed defendant OPTO ELECTRONICS' freight forwarder in Singapore to pick up 23 cartons and include them along with the four other cartons from defendant NEL ELECTRONICS in Singapore, and that the freight forwarder should provide the details for the Mahan Air flight to Iran once available.  Defendant WONG added, "Please be very careful not to offload any of our

24

cartons or miss out any of our cargoes for our shipment especially so is these 4-ctns."

(74)     On or about February 11, 2008, defendant OPTO ELECTRONICS in Singapore sought payment through a freight forwarder associated with defendant LARIJANI in Tehran, Iran, for a shipment of 27 cartons "including 4-ctns from NEL," including the 1,500 modules, valued at USD $203,400.  The document referenced "Mahan Airline," an Iranian airline.

(75)     On or about February 12, 2008, defendant OPTO ELECTRONICS in Singapore shipped from Singapore to Iran 27 cartons of goods, including the 1,500 modules from the United States, through Bangkok, Thailand, on Thai Airways on Flight TG 402 and then to Tehran, Iran, via Mahan Air.

(76)     On or about February 26, 2008, defendant LARIJANI in Iran communicated to defendant NAM in Singapore that LARIJANI had received the 1,500 modules, but LARIJANI had expected to receive 1,504 modules in light of shortages in prior shipments of modules from the United States.

### Failure to Obtain a License

(77)     At no point during any of the transactions described in the overt acts enumerated above did any of the defendants apply for or receive a license or other authorization from the Office of Foreign Assets Control, United States Department of the Treasury, located in the District of Columbia, to export indirectly or directly U.S.-origin commodities from the United States to Iran.

**(Conspiracy to Defraud the United States by
Dishonest Means, in violation of 18 U.S.C. § 371)**

25

## COUNT TWO
### (Smuggling)

27.     The Grand Jury re-alleges paragraphs 1 through 22 and 26 as if specifically set forth herein.

28.     On or about the dates listed below, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, defendants LARIJANI, WONG, PAYA ELECTRONICS, OPTO ELECTRONICS, NAM, and NEL ELECTRONICS, did knowingly and fraudulently export and send, and attempt to export and send from the United States, merchandise, articles, and objects, to wit, modules manufactured by Company A, contrary to laws and regulations of United States, specifically 50 U.S.C. § 1705, 31 C.F.R.§§ 560.203 and 560.204:

|   | APPROXIMATE DATE | DESCRIPTION | OVERT ACT (COUNT ONE) |
|---|---|---|---|
| A | August 24, 2007 | 700 Modules from Company A in Minnesota | (16) |
| B | September 12, 2007 | 1,300 Modules from Company A in Minnesota | (32) |
| C | November 28, 2007 | 2,000 Modules from Company A in Minnesota | (53) |
| D | January 14, 2008 | 500 Modules from Company A in Minnesota | (61) |
| E | February 5, 2008 | 1,500 Modules from Company A in Minnesota | (69) |

**(Smuggling, in violation of 18 U.S.C. § 554; Aiding and Abetting and Causing an Act to be Done, in violation of 18 U.S.C. § 2)**

## COUNT THREE
### (Illegal Exports to Iran and Attempted Illegal Exports to Iran)

29.     The Grand Jury re-alleges paragraphs 1 through 22 and 26  as if specifically set forth herein.

30.     On or about the dates listed below, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, defendants LARIJANI, WONG, PAYA ELECTRONICS, OPTO ELECTRONICS, NAM, and NEL ELECTRONICS did knowingly and willfully violate United States laws with respect to exports to Iran by exporting and causing to be exported goods, and attempting to export and to cause to be exported goods, of the description set forth below from the United States to Iran via Singapore, without first obtaining the required licenses and authorizations from the Office of Foreign Assets Control, United States Department of the Treasury, located in the District of Columbia:

|   | APPROXIMATE DATE | DESCRIPTION | OVERT ACT (COUNT ONE) |
|---|---|---|---|
| A | August 24, 2007 | 700 Modules from Company A in Minnesota | (16) |
| B | September 12, 2007 | 1,300 Modules from Company A in Minnesota | (32) |
| C | November 28, 2007 | 2,000 Modules from Company A in Minnesota | (53) |
| D | J   anuary 14, 2008 | 500 Modules from Company A in Minnesota | (61) |
| E | February 5, 2008 | 1,500 Modules from Company A in Minnesota | (69) |

**(Illegal Exports and Attempted Illegal Exports, in violation of
50 U.S.C. § 1705; 31 C.F.R. §§ 560.203 and 560.204; Aiding and Abetting
and Causing an Act to be Done in violation of 18 U.S.C. § 2)**

27

**COUNT FOUR**
**(Scheme to Make False Statements**
**to the United States Government)**

31.     The Grand Jury re-alleges paragraphs 1 through 22 and 26 as if specifically set forth herein.

32.     From in or about August 2007 and continuing to in or about February 2008, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, in matters within the jurisdiction of the United States Department of Homeland Security, Customs and Border Protection, which is located in the District of Columbia, defendants NAM and NEL ELECTRONICS knowingly and willfully falsified, concealed, and covered up by trick, scheme, and device a material fact, that is, the country of ultimate destination for the 6,000 modules procured from Company A and exported from the United States.

33.     It was a part of this scheme that on or about the following dates, defendants NAM and NEL ELECTRONICS made and caused to be made the following false, fictitious, and fraudulent statements and representations as to a material fact, and made and used and caused to be made and used a false writing and document knowing the same to contain a false, fictitious, and fraudulent entry:

|   | DATE | FORM | FALSE, FICTITIOUS, AND FRAUDULENT STATEMENT AND REPRESENTATION | OVERT ACT (COUNT ONE) |
|---|------|------|-----------------------------------------------------------------|------------------------|
| A | August 25, 2007 | SED/AES | The ultimate destination for the modules was Singapore. | (19) |
| B | September 12, 2007 | SED/AES | The ultimate destination for the modules was Singapore. | (31) |

28

|   | DATE | FORM | FALSE, FICTITIOUS, AND FRAUDULENT STATEMENT AND REPRESENTATION | OVERT ACT (COUNT ONE) |
|---|------|------|----------------------------------------------------------------|-----------------------|
| C | October 27, 2007 | SED/AES | The ultimate destination for the modules was Singapore. | (43) |
| D | January    15, 2008 | SED/AES | The ultimate destination for the modules was Singapore. | (62) |
| E | Febr   uary 6, 2008 | SED/AES | The ultimate destination for the modules was Singapore. | (70) |

**(False Statements, in violation of 18 U.S.C. § 1001(a)(1); Aiding and Abetting, and Causing an Act to be Done, in violation of 18 U.S.C. § 2)**

## COUNT FIVE
### (Scheme to Make False Statements
to the United States Government)

34.     The Grand Jury re-alleges paragraphs 1 through 22 and 26 as if specifically set forth herein.

35.     From in or about August 2007 and continuing to in or about February 2008, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, in matters within the jurisdiction of the United States Department of Homeland Security, Customs and Border Protection, and the United States Department of Commerce, Bureau of Industry and Security, which are located in the District of Columbia, defendants SENG, HIA, and COREZING knowingly and willfully falsified, concealed, and covered up by means of a trick, scheme, and device material facts, that is, the end-use and end-user of the 6,000 modules procured from Company A and exported from the United States.

36.     It was a part of this scheme that on or about the following dates, defendants SENG, HIA, and COREZING made and caused to be made the following false, fictitious, and fraudulent statements and representations as to a material fact, and made and used and caused to be made and used a false writing and document knowing the same to contain a false, fictitious, and fraudulent entry:

| | DATE | FORM | FALSE, FICTITIOUS, AND FRAUDULENT STATEMENT AND REPRESENTATION | OVERT ACT (Count One) |
|---|---|---|---|---|
| A | November 22, 2007 | BIS-711 | The ultimate consignee for the modules was NEL ELECTRONICS and the end-use was a "wireless module" for a "telecom project" located in Singapore. | (51) |
| B | January 11, 2008 | BIS-711 | The ultimate consignee for the modules was NEL ELECTRONICS and the end-use was a "wireless module" for a "telecom project" located in Singapore. | (57) |
| C | February 2, 2008 | BIS-711 | The ultimate consignee for the modules was NEL ELECTRONICS and the end-use was a "wireless module" for a "telecom project" located in Singapore. | (65) |

**(False Statements, in violation of 18 U.S.C. § 1001(a)(1); Aiding and Abetting, and Causing an Act to be Done, in violation of 18 U.S.C. § 2)**

## COUNT SIX
**(False Statement to Law Enforcement)**

37.     The Grand Jury re-alleges paragraphs 1 through 22 and 26 as if specifically set forth herein.

38.     On or about November 12, 2009, defendant WONG in Singapore did knowingly and willfully in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Homeland Security, both of which are agencies within the executive branch of the United States, make a materially false, fictitious, and fraudulent statement and representation when WONG did the following:  indicated that she learned for the first time about the United States embargo on exports to Iran earlier in 2009 when WONG was aware of the United States embargo on exports to Iran prior to that time.

**(False Statement, in violation of 18 U.S.C. § 1001(a)(2))**

31

## COUNT SEVEN
### (False Statement to Law Enforcement)

39.     The Grand Jury re-alleges paragraphs 1 through 22 and 26 as if specifically set forth herein.

40.     On or about November 13, 2009, defendant NAM in Singapore did knowingly and willfully in a matter within the jurisdiction of the United States Department of Commerce and the United States Department of Homeland Security, both of which are agencies within the executive branch of the United States, make a materially false, fictitious, and fraudulent statement and representation when NAM did the following:

a.     stated that he had never heard of the United States' restrictions on the export of U.S.-origin goods to Iran, even though NAM contacted defendant LARIJANI no less than six times (on or about October 25, 2007, September 18, 2008, January 15, 2009, April 22, 2009, June 23, 2009, and June 24, 2009) and discussed the Iran prohibitions and prosecutions in the United States for violations of those prohibitions; and

b.     stated that he always refused to participate in the export of any U.S.-origin goods to Iran, even though NAM had directly participated in five shipments of U.S.-origin modules from Company A to defendant LARIJANI in Iran during 2007 and 2008.

**(False Statement, in violation of 18 U.S.C. § 1001(a)(2))**

## COUNT EIGHT
### (Conspiracy to Defraud the United States by Dishonest Means)

A.     **Background**

41.     Company B was located in the Commonwealth of Massachusetts and was a

manufacturer of antennas suitable for military applications.  Company B manufactured two antennas that were relevant to this Indictment.  Company B manufactured the 2010-1 antenna, which is light-weight, compact in size, and suitable for airborne or shipboard direction finding systems or radar warning receiver applications.  The formal name of the 2010-1 antenna is a Cavity-Backed Spiral Antenna.  Company B also manufactured the 3120 antenna, which is omnidirectional, sealed, and suitable for airborne and shipboard environments including in several military aircraft such as the F-4 Phantom, the F-111, the F-15 Eagle, the A-10 Thunderbolt II, and the F-16 combat jets.   The formal name of the 3120 antenna is a Biconical Antenna.

42.     Individual B was a citizen of the United States and an officer of Company B located in the Commonwealth of Massachusetts.  Individual B is an unindicted co-conspirator whose identity is known to the Grand Jury.

43.     Company C was located in the Commonwealth of Massachusetts.  Cooperator C was the only employee of Company C.

44.     Defendant LIM KOW SENG ("SENG"), also known as "James Wong," and also known as "Eric Lim," was a citizen of Singapore.  SENG was an agent of Company D and COREZING.

45.     Defendant HIA SOO GAN BENSON ("HIA"), also known as "Benson Hia," and also known as "Thomas Yan," was a citizen of Singapore.

46.     Defendant COREZING INTERNATIONAL PTE LTD. ("COREZING"), was a company that was based in Singapore at the addresses of 2021 Butik Batok Street 23, #02-212, Singapore 659626; 111 North Bridge Road, #27-01 Peninsula Plaza, Singapore 179098; 50 East

Coast Road, #2-70 Roxy Square, Singapore 428769; Block 1057 Eunos, Avenue 3 #02-85,

Singapore 409848; and Thompson Road Post Office, PO Box 266, Singapore.  COREZING also

maintained addresses in Hong Kong located at G/F, No. 89, Fuyan Street, Kwun Tong, Hong

Kong; Flat 12, 9F Po Hong Kong, 2 Wang Tung Street, Kowloon Bay, Hong Kong; Flat/RM

2309, 23/F, Ho King COMM Center 2-16 Fa Yuen Street, Mongkok KLN, Hong Kong.

COREZING also maintained addresses in the People's Republic of China at  Room 1007, Block

C2, Galaxy Century Bldg., CaiTian Rd., FuTian District, Shenzhen, China; and Room 1702,

Tower B, Honesty Building, Humen, Dongguan, Guangdong, China.

**B.      The Arms Export Control Act and the
          International Traffic in Arms Regulations**

47.      In furtherance of the national security and foreign policy interests of the United

States, the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, regulated and restricted the

sale of arms, munitions, implements of war, and other defense articles and services.

48.      Pursuant to the authority granted in the AECA, the Defense Directorate of Trade

Controls ("DDTC") of the United States Department of State promulgated regulations, which

were known as the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130.

The ITAR specifically governed the export of "defense articles" and also contained the United

States Munitions List ("USML"), 22 C.F.R. § 121.1, which designates what items are "defense

articles."

49.      "Defense articles," as that term is used in 22 U.S.C. § 2778(b)(2) and the ITAR,

meant items, including technical data, designated for placement on the USML as weapons,

weapons systems, munitions, aircraft, associated equipment, and other implements of war.

50.     For articles designated by DDTC as "defense articles" on the USML, a person or governmental entity seeking to export that item from the United States must have received a license or other approval to do so from the DDTC, located in the District of Columbia.

51.     Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States.  Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection, which was headquartered in the District of Columbia.  A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States.  Furthermore, it was unlawful to use any "export control document" containing a false statement or misrepresenting or omitting a material fact for the purpose of exporting any defense article for which a license or approval is required.  22 C.F.R. § 127.2(a).  An "export control document" included invoices, declarations of destinations, SEDs, bills of lading, and air waybills.

52.     The United States Department of State has certified that Company B's Part Number 2010-1, Cavity-Backed Spiral Antenna, utilizing a modified frequency range of 1.7 to 17.5 Ghz, is a USML item, as defined within the ITAR.

53.     The United States Department of State has certified that Company B's Part Number 3120, Biconical Antenna, utilizing modified frequency range of 18.5 to 39 Ghz, is a USML item, as defined within the ITAR.

54.     These determinations mean that licenses were required from the DDTC to export these items to end-users outside of the United States.

**C.**     **Venue**

55.     The conduct alleged in this Count began outside of the jurisdiction of any

particular State or district and later occurred within the District of Columbia and elsewhere and

was therefore within the venue of the United States District Court for the District of Columbia, as

provided by 18 U.S.C. §§ 3237(a) and 3238.

**D.**     **The Conspiracy**

56.     Between on or about September 22, 2006, and on or about September 24, 2007,

defendants SENG, HIA, COREZING, and others known and unknown to the Grand Jury did

knowingly and willfully conspire, combine, confederate, and agree together and with others

known and unknown to the Grand Jury, to defraud the United States by impeding, impairing,

obstructing, and defeating the lawful function of the United States in administering its export

laws by exporting antennas from Company B in the State of Massachusetts by deceit, craft,

trickery, and dishonest means.

**E.**     **The Object of the Conspiracy**

57.     The object of the conspiracy was for the co-conspirators to make money and to

obtain property by procuring 2010-1 and 3120 antennas from Company B in violation of United

States export laws.

**F.**     **Manner and Means of the Conspiracy**

58.     The conspirators would and did use the following manner and means, among

others, to accomplish the object of the conspiracy:

A.     Defendant SENG in Singapore contacted Company B in Massachusetts to

36

obtain for shipment overseas export controlled antennas, but could not obtain them because Company B required SENG to first obtain a license.

        B.      Cooperator C, on behalf of Company C in Massachusetts, contacted Company B in Massachusetts to obtain these export controlled antennas.

        C.      Company C agreed with defendant SENG to purchase export controlled antennas, model 2010-1 and model 3120, for export to SENG and COREZING.

        D.      In arranging for the purchase of these antennas, Company C coordinated with and took directions from various employees of defendant COREZING in Singapore, including SENG and HIA.

        E.      Company C obtained export controlled antennas, which were defense articles on the USML, for export to defendant COREZING in Singapore and Hong Kong.

        F.      Defendants SENG and COREZING obtained goods from Company C, that is, export controlled antennas manufactured by Company B, that had been exported from the United States knowing that those antennas had been unlawfully obtained under false pretenses.

        G.      Prior to the export controlled antennas being exported from the United States, defendant HIA directed that Cooperator C undervalue the antennas, thereby obviating the need for the filing of an SED and causing false export documents to be prepared.

        H.      No party to this transaction registered with the DDTC in the District of Columbia as an exporter of defense articles on the USML.

        I.      No party to this transaction obtained export licenses from the DDTC in the District of Columbia for export of defense articles.

        J.      Defendant SENG, HIA, COREZING, and others acted across international

borders by conducting and causing to be conducted international shipments of goods and services, including the international shipment of the antennas and the international transfer of monetary payments.

## G.   **Overt Acts**

59.   Beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia, and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the object thereof, defendants COREZING, SENG, HIA, and other co-conspirators committed overt acts, including but not limited to the following:

(1)   On or about September 22, 2006, defendant SENG in Singapore, using his alias "James Wong" and purporting to be an employee of defendant COREZING in Singapore, contacted Company B and attempted to procure 3120 and 3080 series omnidirectional antennas from Company B.

(2)   On or about September 22, 2006, after being advised by Company B that the sale of 3120 and 3080 series omnidirectional antennas from Company B would require an export license and that the end-user must complete a State Department Form DSP-83, defendant SENG in Singapore declined to provide such information, and Company B did not sell the antennas to SENG.

(3)   In or about early November 2006, defendant SENG in Singapore, now using another alias, "Eric Lim," and indicating he was working for Company D in Singapore, attempted to procure 2010-1 and 3080 series antennas from Company B.

(4)   In or about early November 2006, after being advised by Company B that the sale of 2010-1 and 3080 series antennas from Company B required an end-user statement,

defendant SENG in Singapore declined to provide an end-user statement to Company B and refused to purchase the antennas.

(5)     In or about November 2006, Individual B on behalf of Company B contacted Cooperator C with Company C and agreed to sell the export-controlled antennas to defendant SENG in Singapore through Company C without the required export license from the United States government.  Individual B and Cooperator C agreed to alter the antenna frequencies so as to circumvent Company B's internal export compliance controls in order to evade United States export restrictions.

(6)     On or about November 5, 2006, Cooperator C contacted defendant SENG in Singapore and offered to broker antenna sales from Company B.

(7)     From between on or about November 5, 2006, until on or about December 4, 2006, defendant SENG and Cooperator C discussed the antenna exports until SENG informed Cooperator C that SENG had lost the sale but was attempting to get a repeat order for the same antennas the following year.

(8)     On or about January 7, 2007, Cooperator C contacted defendant SENG in Singapore and inquired if SENG had received a new antenna order.

(9)     On or about January 14, 2007, defendant SENG in Singapore requested from Company C a quote for thirty-eight (38) Company B 2010-1 antennas.

(10)     On or about February 15, 2007, Cooperator C received a request for quote for fifty (50) Company B 2010-1 antennas from defendant SENG in Singapore, who held himself out as "James Wong," International Procurement Manager at defendant COREZING in Singapore.

(11)     Between on or about February 15, 2007 and on or about June 1, 2007, with previous knowledge that defendant SENG could not have the antennas exported out of the United States without a license from the United States Department of State, Cooperator C and SENG negotiated the sale of fifty (50) 2010-1 and five (5) 3120 antennas to COREZING.

(12)     Prior to the antennas being exported from the United States, defendant HIA requested that Cooperator C undervalue the antennas on export documents.

(13)     Prior to the antennas being exported from the United States, defendant HIA caused Cooperator C to undervalue the antennas on export documents, which had the effect of circumventing export requirements requiring the filing of SEDs and the accurate completion of shipping documents.

(14)     On or about June 1, 2007, Company C sent defendant COREZING in Singapore an invoice number 12130602, modified by hand to 06010702, which was for the sale to COREZING of fifty (50) 2010-1 and five (5) 3120 antennas at a listed price of USD $81,950.00 with a 10% deposit of USD $8,195.00 due immediately.

(15)     On or about June 5, 2007, defendant COREZING in Singapore forwarded an international wire transfer to the United States bank account of Company C, in the amount of USD $8,195.00, as a ten percent (10%) down payment on the antennas.

(16)     Between July and September of 2007, Company C made shipments to COREZING's addresses in Singapore and Hong Kong as follows:

•     July 25, 2007 shipment of four (4) 2010-1 antennas to Singapore;

•     August 8, 2007 shipment of ten (10) 2010-1 antennas to Singapore;

•     August 15, 2007 shipment of eleven (11) 2010-1 antennas to Singapore;

40

- September 10, 2007 shipment of twelve (12) 2010-1 antennas to Singapore;

- September 24, 2007 shipment of thirteen (13) 2010-1 antennas to Hong Kong.

All of these antennas had a frequency of 1.7 to 17.5 Ghz.  In addition, five 3120 antennas with a frequency of 18.5 to 39 Ghz were included with the shipment dated September 24, 2007.

(17)    In response to a request from defendants HIA and COREZING, on or about the following dates, Cooperator C undervalued all shipments to COREZING on air waybills prepared by Cooperator C and falsely stated the value of the antennas exported to COREZING:  July 25, 2007, August 8, 2007, August 15, 2007, September 10, 2007, and September 24, 2007.

(18)    No party to these transactions – including defendants COREZING, SENG, and HIA – ever applied for or received a license from the DDTC to export these parts from the United States to Singapore or to Hong Kong.

**(Conspiracy to Defraud the United States by
Dishonest Means, in violation of 18 U.S.C. § 371)**

## COUNT NINE
**(Smuggling)**

60.    The Grand Jury re-alleges paragraphs 41 through 55 and 59 as if specifically set forth herein.

61.    On or about the dates listed below, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, defendants SENG, HIA, COREZING and others did knowingly and fraudulently export and send, and attempt to export and send, from the United States, merchandise, articles, and objects, to wit, antennas manufactured by Company B, contrary to laws and regulations of the United States,

41

specifically 22 U.S.C. § 2778(b)(2), and 22 C.F.R. §§ 127.1-127.2:

|   | DATE | QUANTITY | DESTINATION | OVERT ACT (Count Eight) |
|---|------|----------|-------------|-------------------------|
| A | July 25, 2007 | 4 | Singapore | (16) |
| B | August 8, 2007 | 10 | Singapore | (16) |
| C | August 15, 2007 | 11 | Singapore | (16) |
| D | September 10, 2007 | 12 | Singapore | (16) |
| E | September 24, 2007 | 18 | Hong Kong | (16) |

**(Smuggling, in violation of 18 U.S.C. § 554; Aiding and Abetting,
and Causing an Act to be Done, in violation of 18 U.S.C. § 2)**


## COUNT TEN
### (Illegal Exports of Defense Articles and
### Attempted Illegal Exports of Defense Articles)

62.     The Grand Jury re-alleges paragraphs 41 through 55 and 59 as if specifically set

forth herein.

63.     On or about the following dates, beginning outside of the jurisdiction of any

particular State or district, and later within the District of Columbia and elsewhere, defendants

HIA, SENG, COREZING, and others exported and caused to be exported 2010-1 and 3120

antennas to the destination stated below by submitting and causing to be submitted to the United

States government documents containing false statements and misrepresentations and omissions

of material facts for the purpose of exporting defense articles for which a license or approval was

required from the Directorate of Defense Trade Controls, United States Department of State,

located in the District of Columbia, in the following quantities:

| | DATE | QUANTITY | DESTINATION | OVERT ACT (Count Eight) |
|---|---|---|---|---|
| A | July 25, 2007 | 4 | Singapore | (16) |
| B | August 8, 2007 | 10 | Singapore | (16) |
| C | August 15, 2007 | 11 | Singapore | (16) |
| D | September 10, 2007 | 12 | Singapore | (16) |
| E | September 24, 2007 | 18 | Hong Kong | (16) |

**(Illegal Exports and Attempted Illegal Exports, in violation of
22 U.S.C. § 2778(b)(2), and 22 C.F.R. § 127.2; Aiding and Abetting, and
Causing an Act to be Done, in violation of 18 U.S.C. § 2)**

## COUNT ELEVEN
### (Scheme to Conceal)

64.     The Grand Jury re-alleges paragraphs 41 through 59 as though specifically set forth herein.

65.     From in or about July 2007 and continuing until in or about September 2007, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, in matters within the jurisdiction of the United States Department of Homeland Security, Customs and Border Protection, and the United States Department of Commerce, Bureau of Industry and Security, which are located in the District of Columbia, defendants SENG, HIA, COREZING, and Cooperator C knowingly and willfully falsified, concealed, and covered up by means of a trick, scheme, and device material facts, that is, the value of antennas procured from Company B and exported from the United States.

66.     It was a part of this scheme that on or about the following dates, defendants SENG, HIA, COREZING, and Cooperator C made and caused to be made the following false,

fictitious, and fraudulent statements and representations as to a material fact, and made and used

and caused to be made and used a false writing and document knowing the same to contain a

false, fictitious, and fraudulent entry:

| | DATE | FALSE, FICTITIOUS, AND FRAUDULENT ENTRY | OVERT ACT (Count Seven) |
|---|---|---|---|
| A | July 25, 2007 | The value of the antennas being exported was USD $40.00 | (17) |
| B | August 8, 2007 | The value of the antennas being exported was USD $125.00 | (17) |
| C | August 15, 2007 | The value of the antennas being exported was USD $137.50 | (17) |
| D | September 10, 2007 | The value of the antennas being exported was USD $150.00 | (17) |
| E | September 24, 2007 | The value of the antennas being exported was USD $252.50 | (17) |

**(False Statements, in violation of 18 U.S.C. § 1001(a)(1); Aiding and
Abetting, and Causing an Act to be Done, in violation of 18 U.S.C. § 2)**

## COUNT TWELVE
### (Obstruction of Justice)

67.    The Grand Jury re-alleges paragraphs 1 through 4 as though specifically set forth

herein.

**A.    Background**

68.    On or about January 13, 2010, defendant OPTO ELECTRONICS was placed on

the "Entity List" maintained by the Department of Commerce.  This designation by the

Department of Commerce required United States companies exporting many types of goods and

services to OPTO ELECTRONICS to first obtain a license from the Department of Commerce

before making exports to OPTO ELECTRONICS.

69.     On or about February 18, 2010, February 22, 2010, February 23, 2010, February 24, 2010, February 25, 2010, February 26, 2010, and March 13, 2010, defendant LARIJANI in Iran contacted and caused others to contact the United States Department of Commerce in the District of Columbia, to request that OPTO ELECTRONICS be removed from the Entity List.

70.     On or about March 23, 2010, the United States Department of Commerce advised defendant LARIJANI in Iran that in considering whether OPTO ELECTRONICS should be removed from the Entity List, the Department of Commerce would like OPTO ELECTRONICS to disclose the following materials:

> [A]ll records of any involvement with . . . Evertop Services Sdn Bhd, and Majid Kakavand, both of Kuala Lumpur, Malaysia. . . . Such records may include shipping documents, invoices, bills of lading, airway bills, email communications, purchase orders, contracts, wire transfers, checks, money orders and other such documents.

**B.      Obstruction of Official Proceeding**

71.     On or about the dates listed below, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, and in a matter within the jurisdiction of the United States Department of Commerce located within the District of Columbia, defendant LARIJANI in Iran did corruptly attempt to obstruct, influence, and impede an official proceeding by providing and causing to be provided the following types of false information to the Department of Commerce:

a.      On or about March 29, 2010, defendant LARIJANI in Iran stated and caused to be stated in a submission to the Department of Commerce that OPTO ELECTRONICS

had never done business with Majid Kakavand or Evertop Services Sdn Bhd, when LARIJANI

had been in communication with others about his business dealings with Majid Kakavand on or

about May 24, 2006, July 20, 2006, July 24, 2006, November 22, 2006, and April 20, 2009;

      b.      On or about May 27, 2010, defendant LARIJANI in Iran stated and caused

to be stated to a Department of Commerce employee that he did not know an individual named

Majid Kakavand and his company, Evertop Services, when LARIJANI had been in

communication with others about his business dealings with Majid Kakavand on or about May

24, 2006, July 20, 2006, July 24, 2006, November 22, 2006, and April 20, 2009; and

      c.      On or about May 27, 2010, defendant LARIJANI stated and caused to be

stated to a Department of Commerce employee that "[d]uring all [his] business history" he had

never had any dealings with Majid Kakavand, when LARIJANI had been in communication with

others about his business dealings with Majid Kakavand on or about May 24, 2006, July 20,

2006, July 24, 2006, November 22, 2006, and April 20, 2009.

**(Attempt to Obstruct Justice, in violation of 18 U.S.C. § 1512(c)(2); Aiding and
Abetting, and Causing an Act to be Done, in violation of 18 U.S.C. § 2)**

**FORFEITURE ALLEGATION**
**(As to Counts Two and Three)**

      72.      The allegations contained in Counts Two and Three are re-alleged as though set

forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the

United States of America pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

§ 2461(c).

      73.      As a result of committing one or more of the offenses alleged in Counts Two and

Three of this Indictment, in violation of 18 U.S.C. § 554, 50 U.S.C. § 1705, 31 C.F.R. Part 560,

and 18 U.S.C. § 2, defendants LARIJANI, WONG, PAYA ELECTRONICS, OPTO

ELECTRONICS, NAM, NEL ELECTRONICS, SENG, HIA, and COREZING, shall forfeit to

the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property,

real and personal, that constitutes or is derived from proceeds traceable directly or indirectly, to

the commission of the offenses alleged in Counts Two and Three of this Indictment, including,

but not limited to, a sum of money representing the amount of proceeds obtained as a result of

the offenses:

> Money Judgment:  In the amount of at least $510,000, which
> represents a sum of money constituting, or derived from, proceeds
> obtained, directly or indirectly, as a result of the offenses alleged in
> Counts Two and Three of this Indictment.

74.     If any of the above-described forfeitable property, as a result of any act or

omission of a defendant(s):

> (a)     cannot be located upon the exercise of due diligence;
>
> (b)     has been transferred or sold to, or deposited with, a third
>          party;
>
> (c)     has been placed beyond the jurisdiction of the court;
>
> (d)     has been substantially diminished in value; or
>
> (e)     has been commingled with other property which cannot be
>          subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other

property of said defendants up to the value of the above forfeitable property.

**(Criminal Forfeiture, in violation 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))**

---

47

## FORFEITURE ALLEGATION
### (As to Counts Nine and Ten)

75.     The allegations contained in Counts Nine and Ten are re-alleged as though set

forth fully herein and incorporated by reference for the purpose of alleging forfeiture to the

United States of America pursuant to the provisions of 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.

§ 2461(c).

76.     As a result of committing one or more of the offenses alleged in Counts Nine and

Ten of this Indictment, in violation of 18 U.S.C. § 554, 22 U.S.C. § 2778, 22 C.F.R. Parts 120-

130, and 18 U.S.C. § 2, defendants SENG, HIA, and COREZING, shall forfeit to the United

States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and

personal, that constitutes or is derived from proceeds traceable directly or indirectly, to the

commission of the offenses alleged in Counts Nine and Ten of this Indictment, including, but not

limited to, a sum of money representing the amount of proceeds obtained as a result of the

offenses:

> Money Judgment:  In the amount of at least $81,950 which
> represents a sum of money constituting, or derived from, proceeds
> obtained, directly or indirectly, as a result of the offenses alleged in
> Counts Nine and Ten of this Indictment.

77.     If any of the above-described forfeitable property, as a result of any act or

omission of a defendant(s):

>    (a)     cannot be located upon the exercise of due diligence;

>    (b)     has been transferred or sold to, or deposited with, a third
>            party;

>    (c)     has been placed beyond the jurisdiction of the court;

>    (d)     has been substantially diminished in value; or

48

      (e)      has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other

property of said defendants up to the value of the above forfeitable property.

**(Criminal Forfeiture, in violation 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))**

A TRUE BILL

_____FOREPERSON

Attorney of the United States in
and for the District of Columbia