IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 10-174 (EGS) |
| v. : | |
| LIM KOW SENG (a/k/a "Eric Lim," : a/k/a "James Wong"), and : | **FILED** JUN 2 6 2013 U.S. DISTRICT COURT |
| HIA SOO GAN BENSON (a/k/a "Benson : Hia," a/k/a "Thomas Yan") : | |
| Defendants. : | |

### STATEMENT OF FACTS TO SUPPORT GUILTY PLEAS

Had this case gone to trial, the United States would have proven beyond a reasonable doubt that:

#### General Allegations

At all times material herein:

1. Defendant LIM KOW SENG ("LIM"), also known as "James Wong," and also known as "Eric Lim," was a citizen of Singapore. LIM was an agent of Company D and of Corezing International Pte Ltd ("Corezing").

2. Defendant HIA SOO GAN BENSON ("HIA"), also known as "Benson Hia," and also known as "Thomas Yan," was a citizen of Singapore.

3. Company B was located in the Commonwealth of Massachusetts and was a manufacturer of antennas suitable for military applications. Company B manufactured two antennas that were relevant to this Indictment. Company B manufactured the 2010-1 antenna, which is light-weight, compact in size, and suitable for airborne or shipboard direction finding

1

systems or radar warning receiver applications. The formal name of the 2010-1 antenna is a Cavity-Backed Spiral Antenna. Company B also manufactured the 3120 antenna, which is omnidirectional, sealed, and suitable for airborne and shipboard environments including in several military aircraft. The formal name of the 3120 antenna is a Biconical Antenna.

4.      Individual B was a citizen of the United States and an officer of Company B located in the Commonwealth of Massachusetts. Individual B is an unindicted co-conspirator who has pleaded guilty and is a cooperating defendant.

5.      Company C was located in the Commonwealth of Massachusetts. Cooperator C was the only employee of Company C. Cooperator C has pleaded guilty and is a cooperating defendant.

6.      Corezing was a company that was based in Singapore at the addresses of 2021 Butik Batok Street 23, #02-212, Singapore 659626; 111 North Bridge Road, #27-01 Peninsula Plaza, Singapore 179098; 50 East Coast Road, #2-70 Roxy Square, Singapore 428769; Block 1057 Eunos, Avenue 3 #02-85, Singapore 409848; and Thompson Road Post Office, PO Box 266, Singapore. Corezing also maintained addresses in Hong Kong located at G/F, No. 89, Fuyan Street, Kwun Tong, Hong Kong; Flat 12, 9F Po Hong Kong, 2 Wang Tung Street, Kowloon Bay, Hong Kong; Flat/RM 2309, 23/F, Ho King COMM Center 2-16 Fa Yuen Street, Mongkok KLN, Hong Kong. Corezing also maintained addresses in the People's Republic of China at Room 1007, Block C2, Galaxy Century Bldg., CaiTian Rd., FuTian District, Shenzhen, China; and Room 1702, Tower B, Honesty Building, Humen, Dongguan, Guangdong, China.

<u>The Arms Export Control Act and the International Traffic in Arms Regulations</u>

7.      In furtherance of the national security and foreign policy interests of the United

States, the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, regulated and restricted the sale of arms, munitions, implements of war, and other defense articles and services.

8. Pursuant to the authority granted in the AECA, the Directorate of Defense Trade Controls ("DDTC") of the United States Department of State promulgated regulations, which were known as the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120–130. The ITAR specifically governed the export of "defense articles" and also contained the United States Munitions List ("USML"), 22 C.F.R. § 121.1, which designates what items are "defense articles."

9. "Defense articles," as that term is used in 22 U.S.C. § 2778(b)(2) and the ITAR, meant items, including technical data, designated for placement on the USML as weapons, weapons systems, munitions, aircraft, associated equipment, and other implements of war.

10. For articles designated by DDTC as "defense articles" on the USML, a person or governmental entity seeking to export that item from the United States must have received a license or other approval to do so from the DDTC, located in the District of Columbia.

11. Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings were filed electronically through the Automated Export System ("AES") administered by the United States Department of Homeland Security ("DHS"), Customs and Border Protection, which was headquartered in the District of Columbia. A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the United States. Furthermore, it was unlawful to use any "export control document" containing a false statement or misrepresenting or omitting a

3

material fact for the purpose of exporting any defense article for which a license or approval is required. 22 C.F.R. § 127.2(a). An "export control document" included invoices, declarations of destinations, SEDs, bills of lading, and air waybills.

12.   A material part of these export filings is information concerning the end-user or ultimate destination of the export. The identity of the end-user may determine whether the goods may be exported without any specific authorization from the United States government; whether the goods may be exported with a specific authorization or license from the United States Department of Commerce, the United States Department of State, or the United States Department of Treasury; or whether the goods may not be exported from the United States under any circumstances.

13.   The United States Department of State has certified that Company B's Part Number 2010-1, Cavity-Backed Spiral Antenna, utilizing a modified frequency range of 1.7 to 17.5 Ghz, is a USML item, as defined within the ITAR.

14.   The United States Department of State has certified that Company B's Part Number 3120, Biconical Antenna, utilizing modified frequency range of 18.5 to 39 Ghz, is a USML item, as defined within the ITAR.

15.   These determinations mean that licenses were required from the DDTC to export these items to end-users outside of the United States.

## Venue

16.   The conduct outlined in this Statement of Facts began outside of the jurisdiction

of any particular State or district and later occurred within the District of Columbia and elsewhere and was therefore within the venue of the United States District Court for the District of Columbia, as provided by 18 U.S.C. §§ 3237(a) and 3238.

### The Conspiracy to Export U.S.-Origin Goods and to Defraud the United States

17. Between on or about September 22, 2006, and on or about September 24, 2007, defendants LIM and HIA, together with Corezing and other co-conspirators, did knowingly and willfully conspire, combine, confederate, and agree together and with others, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful function of the United States in administering its export laws by exporting antennas from Company B in the State of Massachusetts by deceit, craft, trickery, and dishonest means.

### The Object of the Conspiracy

18. The object of the conspiracy was for the co-conspirators to make money and to obtain property by procuring 2010-1 and 3120 antennas from Company B in violation of United States export laws.

### Manner and Means of the Conspiracy

19. The conspirators would and did use the following manner and means, among others, to accomplish the object of the conspiracy:

    A. Defendant LIM in Singapore contacted Company B in Massachusetts to obtain for shipment overseas export controlled antennas, but could not obtain them because Company B required LIM to first obtain a license.

    B. Cooperator C, on behalf of Company C in Massachusetts, contacted Company B in Massachusetts to obtain these export controlled antennas.

  C. Company C agreed with defendant LIM to purchase export controlled antennas, model 2010-1 and model 3120, for export to LIM and Corezing.

  D. In arranging for the purchase of these antennas, Company C coordinated with and took directions from various employees of Corezing in Singapore, including LIM and HIA.

  E. Company C obtained export controlled antennas, which were defense articles on the USML, for export to Corezing in Singapore and Hong Kong.

  F. Defendant LIM and Corezing obtained goods from Company C, that is, export controlled antennas manufactured by Company B, which had been exported from the United States knowing that those antennas had been unlawfully obtained under false pretenses.

  G. Prior to the export controlled antennas being exported from the United States, defendant HIA directed that Cooperator C undervalue the antennas, thereby obviating the need for the filing of an SED and causing false export documents to be prepared.

  H. No party to this transaction registered with the DDTC in the District of Columbia as an exporter of defense articles on the USML.

  I. No party to this transaction obtained export licenses from the DDTC in the District of Columbia for export of defense articles.

  J. Defendants LIM and HIA, together with Corezing and others, acted across international borders by conducting and causing to be conducted international shipments of goods and services, including the international shipment of the antennas and the international transfer of monetary payments.

## Overt Acts

20. Beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia, and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the object thereof, defendants LIM and HIA, together with Corezing and other co-conspirators, committed overt acts, including but not limited to the following:

(1) On or about September 22, 2006, defendant LIM in Singapore, using his alias "James Wong" and purporting to be an employee of Corezing in Singapore, contacted Company B and attempted to procure 3120 and 3080 series omnidirectional antennas from Company B.

(2) On or about September 22, 2006, after being advised by Company B that the sale of 3120 and 3080 series omnidirectional antennas from Company B would require an export license and that the end-user must complete a State Department Form DSP-83, defendant LIM in Singapore declined to provide such information, and Company B did not sell the antennas to LIM.

(3) In or about early November 2006, defendant LIM in Singapore, now using another alias, "Eric Lim," and indicating he was working for Company D in Singapore, attempted to procure 2010-1 and 3080 series antennas from Company B.

(4) In or about early November 2006, after being advised by Company B that the sale of 2010-1 and 3080 series antennas from Company B required an end-user statement, defendant LIM in Singapore declined to provide an end-user statement to Company B and refused to purchase the antennas.

(5) In or about November 2006, Individual B on behalf of Company B contacted Cooperator C with Company C and agreed to sell the export-controlled antennas to

7

defendant LIM in Singapore through Company C without the required export license from the United States government. Individual B and Cooperator C agreed to alter the antenna frequencies so as to circumvent Company B's internal export compliance controls in order to evade United States export restrictions.

(6) On or about November 5, 2006, Cooperator C contacted defendant LIM in Singapore and offered to broker antenna sales from Company B.

(7) From between on or about November 5, 2006, until on or about December 4, 2006, defendant LIM and Cooperator C discussed the antenna exports until LIM informed Cooperator C that LIM had lost the sale but was attempting to get a repeat order for the same antennas the following year.

(8) On or about January 7, 2007, Cooperator C contacted defendant LIM in Singapore and inquired if LIM had received a new antenna order.

(9) On or about January 14, 2007, defendant LIM in Singapore requested from Company C a quote for thirty-eight (38) Company B 2010-1 antennas.

(10) On or about February 15, 2007, Cooperator C received a request for quote for fifty (50) Company B 2010-1 antennas from defendant LIM in Singapore, who held himself out as "James Wong," International Procurement Manager at Corezing in Singapore.

(11) Between on or about February 15, 2007, and on or about June 1, 2007, with previous knowledge that defendant LIM could not have the antennas exported out of the United States without a license from the United States Department of State, Cooperator C and LIM negotiated the sale of fifty (50) 2010-1 and five (5) 3120 antennas to Corezing.

(12) Prior to the antennas being exported from the United States, defendant

HIA requested that Cooperator C undervalue the antennas on export documents.

(13) Prior to the antennas being exported from the United States, defendant HIA caused Cooperator C to undervalue the antennas on export documents, which had the effect of circumventing export requirements requiring the filing of SEDs and the accurate completion of shipping documents.

(14) On or about June 1, 2007, Company C sent Corezing in Singapore an invoice number 12130602, modified by hand to 06010702, which was for the sale to Corezing of fifty (50) 2010-1 and five (5) 3120 antennas at a listed price of USD $81,950.00 with a 10% deposit of USD $8,195.00 due immediately.

(15) On or about June 5, 2007, Corezing in Singapore forwarded an international wire transfer to the United States bank account of Company C, in the amount of USD $8,195.00, as a ten percent (10%) down payment on the antennas.

(16) Between July and September of 2007, Company C made shipments to Corezing's addresses in Singapore and Hong Kong as follows:

- July 25, 2007 shipment of four (4) 2010-1 antennas to Singapore;
- August 8, 2007 shipment of ten (10) 2010-1 antennas to Singapore;
- August 15, 2007 shipment of eleven (11) 2010-1 antennas to Singapore;
- September 10, 2007 shipment of twelve (12) 2010-1 antennas to Singapore;
- September 24, 2007 shipment of thirteen (13) 2010-1 antennas to Hong Kong.

All of these antennas had a frequency of 1.7 to 17.5 Ghz. In addition, five (5) 3120 antennas with a frequency of 18.5 to 39 Ghz were included with the shipment dated September 24, 2007.

(17) In response to a request from defendant HIA and Corezing, on or about the

following dates, Cooperator C undervalued all shipments to Corezing on air waybills prepared by Cooperator C and falsely stated the value of the antennas exported to Corezing: July 25, 2007, August 8, 2007, August 15, 2007, September 10, 2007, and September 24, 2007.

(18)    No party to these transactions —including defendants LIM and HIA— ever applied for or received a license from the DDTC to export these parts from the United States to Singapore or to Hong Kong.

### Limited Nature of Statement of Facts

21.    This proffer of evidence is not intended to constitute a complete statement of all facts known by defendants LIM and HIA, but instead provides a sufficient factual predicate for their guilty pleas. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendants LIM and HIA to plead guilty to Count Eight of the Indictment, that is, the charge of Conspiracy to Defraud the United States by Dishonest Means, in violation of 18 U.S.C. § 371.

Respectfully submitted,

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 415793

_____
Anthony Asuncion
Assistant United States Attorney
National Security Section
D.C. Bar No. 420822
(202) 252-7786
Anthony.Asuncion@usdoj.gov

_____
Richard S. Scott

Trial Attorney
Counterespionage Section
D.C. Bar No. 502455
(202) 233-2263
Richard.S.Scott@usdoj.gov

### Defendant Lim Kow Seng's Stipulation and Signature

After consulting with my attorney, David Bos, and pursuant to the Plea Agreement entered into this day with the United States, I hereby stipulate that the above Statement of Facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_6/26/13_  
Date

_____  
Lim Kow Seng  
Defendant

### Defendant Lim Kow Seng's Counsel's Acknowledgment

I am counsel for the defendant, Lim Kow Seng. I have carefully reviewed the above Statement of Facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

_6/24/13_  
Date

_____  
David Bos, Esq.  
Counsel for Defendant Lim Kow Seng

12

### Defendant Hia Soo Gan Benson's Stipulation and Signature

After consulting with my attorney, Douglas C. McNabb, and pursuant to the Plea Agreement entered into this day with the United States, I hereby stipulate that the above Statement of Facts is true and accurate. I further stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

6/14/13
Date

Hia Soo Gan Benson
Defendant

### Defendant Hia Soo Gan Benson's Counsel's Acknowledgment

I am counsel for the defendant, Hia Soo Gan Benson. I have carefully reviewed the above Statement of Facts with my client. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

6-26-13
Date

Douglas C. McNabb, Esq.
Counsel for Defendant Hia Soo Gan Benson