## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-174 (EGS)** |
| | ) | |
| **LIM KOW SENG,** | ) | |
| **Defendant.** | ) | |
| ———————————————— | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Lim Kow Seng, by his attorney, David W. Bos, Assistant Federal Public Defender, hereby submits the following memorandum in aid of sentencing in this matter.  Pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a) as delineated in Rita v. United States, 127 S. Ct. 2456 (2007), Kimbrough v. United States, 128 S. Ct. 558 (2007) and Gall v. United States, 128 S. Ct. 586 (2007), and applying the "Smith departure" in  United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994), Mr. Seng respectfully requests that the Court impose a sentence of "time served" (the equivalent of a 34 month term of  imprisonment[1]), with no supervised release.  See, U.S.S.G. §5D1.1.  Mr. Seng submits that the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553.  In support of this request, counsel states:

1.  Mr. Seng appears before the Court for sentencing after having pled guilty to one count of Conspiracy to Defraud the United States, in violation of 18 U.S.C. §371 .

---

[1]Mr. Seng has been in custody nearly two years and has incurred no disciplinary infractions during his detention. Under 18 U.S.C. §3624(b), the "good time" statute, any sentence imposed by the Court would be reduced up to 54 days per year. Under Smith, Mr. Seng's sentence may be reduced an additional six months due to his status as a deportable alien. The imposition of a 34 months sentence, when coupled with the application 18 U.S.C. §3624(b) and Smith, results in a 24month term of imprisonment.

2.  Mr. Seng is 44 years old and  has no criminal history points, and is therefore Criminal History Category I offender under the advisory sentencing guidelines.

3. Although Mr. Seng's criminal history, couple with the nature of the charges against him, normally would have resulted in his release pending resolution of this matter – and the strong likelihood that he would be allowed to self-surrender to serve his sentence in a minimum security facility – Mr. Seng has been instead been subjected to unusually harsh conditions of pretrial incarceration.

Mr. Seng has been detained in connection with this matter for nearly two years. The first 13 months of that incarceration was spent in prison in Singapore, as Mr. Seng awaited extradition from the Singapore to the United States. Since leaving Singapore in December of last year, Mr. Seng has been detained at the D.C. Jail. Mr. Seng, therefore, has been subjected to unusually harsh confinement conditions for a first time offender.

4. As noted in the Pre-Sentence Report, there no evidence Mr. Seng has ever abused any illegal substance. According to the staff at the DC Jail, Mr. Seng has been a model inmate during his incarceration. Indeed, within weeks of his incarceration at the D.C. Jail Mr. Seng obtained his G.E.D. and began tutoring other inmates seeking to obtain their G.E.D. According to Mark MacAllaster, the G.E.D. Inmate Program Coordinator, Mr. Seng's efforts on he behalf of the other inmates at the Jail have been "exemplary."

5. Upon his "release" in this case Mr. Seng will be taken into custody by the Bureau of Immigration and Customs Enforcement agency, where he will remain detained pending his return to the Singapore. This period of detention could last several months.

**<u>DISCUSSION</u>**

In imposing the sentence in this case, the Court must consider all the factors set forth in 18 U.S.C. §3553(a).  <u>Gall v. United States</u>, 128 S. Ct. 586 (2007).   Pursuant to 18 U.S.C. §§ 3562 and 3553(a) sentencing courts should consider the need for the sentence imposed

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in Title 18 U.S.C. §3553(a).

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Pursuant to 18 U.S.C. § 3661:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence.

Section 3582 of Title 18 states that

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Although the Court is still required to consult the Guidelines in determining the what sentence to impose pursuant to 18 U.S.C. §3553, the Court may not presume that the resulting guideline sentence is a correct one. Rita v. United States, 127 S. Ct. 2456, 2457. The Court is free to consider whether the guideline sentence itself "fails to properly to reflect §3553(a) considerations" in the case at hand. Rita, 127 S. Ct. At 2465.

## 1. Advisory Guideline Range

The Probation Department, using the 2012 edition of the Sentencing Guidelines Manual, has concluded that the Adjusted Offense Level in this case is 23 and that Mr. Seng's Criminal History Category is I, resulting in an advisory sentencing range for imprisonment of 46 to 57 months. Mr. Seng does not dispute the Probation Department's calculation of the guideline range in this case; however, Mr. Seng submits that for the reasons outlined more fully below the Court should accord minimal deference to the advisory guideline range in this case. Instead, the Court should impose a sentence consistent with the sentencing range set forth in 18 U.S.C. § 351 and 2778, which envisions that some offenders be sentenced to probation.

Although the Court is still required to consult the Sentencing Guidelines in determining the what sentence to impose pursuant to 18 U.S.C. §3553, the Court may not presume that the resulting advisory  guideline sentence is a correct one. Rita v. United States, 127 S. Ct. 2456, 2457. Nor may the Court presume that the resulting guideline sentence is presumptively reasonable.  Nelson v. United States, 555 U. S. 338 (2009)("The Guidelines are not only *not*

4

*mandatory* on sentencing courts; they are also not to be *presumed* reasonable")(emphasis

original). The Court is free to consider whether the guideline sentence itself "fails to properly to

reflect §3553(a) considerations" in the case at hand. Rita, 127 S. Ct. At 2465.

      The Court can also consider whether or not  the advisory guideline exemplifies the

Sentencing Commission's "exercise of its characteristic institutional role" of drafting guidelines

using "an empirical approach based on past practices and national experience, guided by a

professional staff with appropriate expertise." Kimbrough v. United States, 128 S. Ct. 558, 567,

570 (2007).  As Judge Adelman recently noted, "[t]o the extent that the advisory guidelines

deserve continued respect form the courts, that respect will be greatest where the Commission

has satisfied its institutional role of relying on evidence and study to develop sound sentencing

practices." United States v. Hanson, 561 F. Supp. 2d 1004, 1009 (E.D. of Wisc. 2008).   Where,

however,  the guideline does not represent the Commissions' exercise of its characteristic

institutional role, the guideline deserves minimal deference. Id. See also, United States v.

Grossman, 513 F.3d 592 (6th Cir. 2008); United States v. Baird , 2008 WL 151258 (D. Neb. Jan.

11, 2008).

      When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission

to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. §

991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-

guidelines period as a "starting point." 28 U.S.C. § 994(m).  The Commission was then to

continually review and revise the guidelines in light of sentencing data, criminological research,

and consultation with frontline actors in the criminal justice system.  See 28 U.S.C. §

991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).  The original Commissioners

abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly developed the guidelines based on an empirical study of time served for various offenses before the guidelines. See USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 7 (1988).

In Rita v. United States, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. Id. at 348-50. The Court recognized, however, that not all guidelines were developed in this manner. See Gall v. United States, 552 U.S. 38, 46 & n.2 (2007); Kimbrough v. United States, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Id. at 109-10.

**a. United States Sentencing Guideline 2M5.2**

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses, Breyer, supra, 17 Hofstra L. Rev. at 22-23, and required some form of confinement for all but the least serious

6

cases. The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987); see also U.S. Sent'g Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 56 (2004) [hereinafter Fifteen Year Report] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement").

The Commission's deterrence rationale, however, was not based on empirical evidence. The empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. See David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just three years after the Guidelines went into effect, prison sentences for U.S.S.G. §2M5.2 offenders were steadily increased. In Mr. Seng's case, those unsupported increases have raised his guideline range of imprisonment nearly *four hundred percent*.

As noted below, U.S.S.G. §2M5.2 is a classic example of a guideline not based on

empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2M5.2, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. See Pepper v. United States, 562 U. S. __, __, Slip Op. at 23 (2011); Spears v. United States, 129 S. Ct. 840, 843 (2009); Kimbrough, 552 U.S. 101-02, 109-10; Rita, 551 U.S. at 351, 357.

When it initially adopted U.S.S.G. §5M5.2, the Commission created a Base Offense Level of 14 for violations of 22 U.S.C. §2778 involving non-sophisticated "weaponry."[2] See USSG § 2M5.2 (1987). The resulting guideline of imprisonment for those Criminal History Category I offenders was 15-21 months. For those Criminal History Category I offenders who received a two-point reduction in their Base Offense Level for Acceptance of Responsibility, the guideline range for imprisonment was reduced to 10-16 months.

Just three years later, the Commission increased the Base Offense Level of U.S.S.G. §5M5.2 from 14 to 22 for all violations of 22 U.S.C. §2778, unless "the offense involved only non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed ten." U.S.S.G. App. C, amend. 337. The Commission put forth no explanation for this *eight-level* increase in the Base Offense Level. Rather, the Commission simply stated,"[t]his amendment revises the guideline to better distinguish the more and less serious forms of offense

---

[2]For Title 22 U.S.C. §2778 offenses involving "sophisticated weaponry," the Base Offense Level was 22, resulting in a guideline range of imprisonment for Criminal History Category 1 offenders of 41-51 months. For those offenders who received a reduction in their Base Offense Level for Acceptance of Responsibility, the guideline range for imprisonment was reduced to 30-37 months.

conduct covered" by 22 U.S.C. §2778. U.S.S.G. App. C, amend. 337.

In 2001, the Commission increased the Base Offense Level of U.S.S.G. §2M5.2 from 22 to 26 for all violations of 22 U.S.C. §2778, unless "the offense involved only (A) non-fully automatic small arms (rifles, handguns, or shotguns), and the number of weapons did not exceed two, (B) ammunition for non-fully automatic small arms, and the number of rounds did not exceed 500, or © both. U.S.S.G. App. C, amend. 633.  The Commission's justification for this additional four-level increase was not a careful review of the "empirical data and national experience of past sentencing practices" or "consultation with other frontline actors, civil liberties groups, and experts" in the criminal justice system, see Rita v. United States, 551 U.S. 338, 348-350. Rather, the Commission's sole justification for this four-level increase was to respond to a "sense of Congress" that "guideline penalties [were] inadequate for certain offenses involving importation and exportation of nuclear, chemical, and biological weapons, materials, or technologies." U.S.S. App. C, amend. 633, Reasons for Amendment.[3]

In this case, these two empirically unsupported increases in the Base Offense Level of U.S.S.G. §2M5.2 have raised Mr. Seng's Adjusted Offense Level from 12[4] to 23, and raised his guideline range of imprisonment from 10-16 months to 46-57 months. As a result, Mr. Seng's Base Offense Level has nearly doubled, and  advisory guideline range is now **four times** the

---

[3]The instant case, of course, has nothing to do withthe exportation of nuclear, chemical, and biological weapons, materials, or technologies.

[4] Under the 1987 Guidelines, Mr. Seng's Base Offense Level would be 14, and with a two-point reduction for Acceptance of Responsibility Mr. Seng's Adjusted Offense Level would be 12.

guideline range under the original 1987 Guideline. To the extent the Court seeks any guidance

from U.S.S.G. §5M5.2, the Court should look to U.S.S.G. §5M5.2 as it was originally developed

by the Commission in 1987, when the Commission properly used it's "characteristic institution

role" of drafting guidelines using "an empirical approach based on past practices and national

experience, guided by a professional staff with appropriate expertise." Kimbrough v. United

States, 128 S. Ct. 558, 567, 570 (2007). Using this approach results in a guideline range of 15-21

months. This, therefore, is the sentencing range from which the Court should begin its analysis

under 18 U.S.C. §3553.


**2. Imposition of Sentence Pursuant 18 U.S.C. §3553**

        As noted above, pursuant to 18 U.S.C. §§ 3562 and 3553(a) sentencing courts should

consider the need for the sentence imposed 1) to reflect the seriousness of the offense, to promote

respect for the law, and to provide just punishment for the offense; 2) to afford adequate

deterrence to criminal conduct; 3) to protect the public from further crimes of the defendant; and

4) to provide the defendant with the needed educational and vocational training, medical care, or

other correctional treatment in the most effective manner.

        Section 3553(a) further directs sentencing courts to consider the nature and circumstances

of the offense, the history and characteristics of the defendant, the range of sentences available,

the need to avoid unwanted sentencing disparities among defendants with similar records who

have been found guilty of similar conduct, and the need to provide restitution to any victims of

the offenses charged. Specifically, courts should "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes" set forth above.

**Nature of the Offense**

Mr. Seng  in no way intends to diminish the seriousness of this offense, but notes that the crime for which he stands convicted is not crime of violence or drug trafficking offense. The instant charge is a Class D felony and carries maximum sentence of five years, and no mandatory minimum sentence; Congress, therefore, envisioned that some defendants convicted under the statute receive probationary sentences.

**Mr. Seng has been punished far beyond what is just**

Mr. Seng has not only lost his professional reputation, but has experienced exceedingly harsh conditions of pre-trial confinement. See, e.g., United States v. Gaind, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); United States v. Vigil, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); United States v. Samaras, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction), as well as the exceedingly harsh conditions of his pretrial confinement. See, e.g., United States v. Mateo, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) ("the extraordinary trauma Mateo has already suffered during the time she has served in custody," when left unattended in her cell without medical attention during fifteen hours of labor, "the full effects of which can never be comprehensively gauged, has

inflicted forms of pain and suffering that have effectively enhanced, to a disproportionate degree, the level of punishment contemplated to be experienced by inmates in the typical case during the period of incarceration prescribed by the Guidelines."); United States v. Pressley, 345 F.3d 1205, 1218-19 (11th Cir. 2003) (district court had discretion to grant downward departure because defendant was on 23-hour-a-day lockdown during five years of pretrial confinement); United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001) ("pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures").

**Need for Deterrence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. See Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity:  An Analysis of Recent Research (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. Id. at 1.  It examined the effects of changes to both the certainty and severity of punishment. Id.

12

While significant correlations were found between the certainty of punishment and crime rates,

the "correlations between sentence severity and crime rates . . . were not sufficient to achieve

statistical significance." Id. at 2. The report concluded that "the studies reviewed do not provide a

basis for inferring that increasing the severity of sentences is capable of enhancing deterrent

effects." Id. at 1. Research regarding white collar offenders in particular (presumably the most

rational of potential offenders) found no difference in the deterrent effect of probation and that of

imprisonment.  See David Weisburd et al., Specific Deterrence in a Sample of Offenders

Convicted of White Collar Crimes, 33 Criminology 587 (1995); see also Gabbay, supra, at 448-

49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have

a general and specific deterrent effect on potential white-collar offenders.").

**Need for Incapacitation**

Mr. Seng has an exceptionally low risk of recidivism. Mr. Seng is 44 years old, a first

offender, a university graduate, has been employed throughout his adult life, and has no history

of drug or alcohol abuse. For all male offenders in Criminal History Category I, the recidivism

rate is 15.2%. For those who are college graduates, the rate in CHC I is just 7.1%; and for those

who have been employed, the rate is 12.7%. For those with no history of illicit drug use, the

recidivism rate is half that of those who do have a drug history. Undoubtedly, for those like Mr.

Seng who are educated, have been employed,, are drug free, the combined rate is even lower. See

U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal

Sentencing Guidelines,  (May 2004) [hereinafter Measuring Recidivism]. For all Category I

defendants convicted of white collar offenses, the recidivism rate is just 9.3%, the lowest of any

13

offense category, which is 45% below the rate for all white collar offenders.  Id.. Finally,

offenders like Mr. Seng with zero criminal history points have a rate of recidivism half that of

offenders with one criminal history point. See Sent'g Comm'n, Recidivism and the "First

Offender," (May 2004) [hereinafter First Offender]. The Commission has recognized the

advisability of revising the guidelines to take age and first offender status into account. See First

Offender at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the

guideline criminal history structure"); Measuring Recidivism  at 16 (noting that "[o]ffender age

is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if

incorporated into the criminal history computation").  The Commission has not implemented any

such revisions to the criminal history guidelines, but has recently stated that age "may be

relevant" in granting a departure.  USSG § 5H1.1. This Court, therefore, in imposing the least

sentence sufficient to account for the need to protect the public from further crimes of Mr. Seng,

should consider the statistically low risk of recidivism presented by Mr. Seng's history and

characteristics.  See, e.g., United States v. Darway, 255 Fed. Appx. 68, 73 (6th Cir. 2007)

(upholding downward variance on basis of defendant's first-offender status); United States v.

Hamilton, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not

taking into account policy considerations with regard to age recidivism not included in the

Guidelines"); United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-

guideline sentence based on defendant's age, which made it unlikely that he would again be

involved in a violent crime); United States v. Urbina, slip op., 2009 WL 565485, *3 (E.D. Wis.

Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal

record, positive work history, and strong family ties); United States v. Cabrera, 567 F. Supp. 2d

271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); Simon v. United States, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); United States v. Nellum, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

**Kinds of Sentences Available**

This Court must now consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a lengthy prison term.  See Gall, 128 S. Ct. at 602 & n.11.  Further, Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."  28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the

15

imposition of alternative sentences, such as restitution and community service."  See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Mr. Seng is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."

**Smith Departure**

Finally, as noted in the Pre-Sentence Report, Mr. Seng submits that downward departure under United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994) is warranted in this case, and that he is eligible for a downward departure of up to six months based on his status as a deportable alien, as that status will increase both the length *and* the severity of his confinement.   Among other things, because Mr. Seng will be deported following the sentence imposed by this Court, he will not receive the same benefits or programs within the Federal Bureau of Prisons as other prisoners.  In addition, unlike other federal prisoners, he will not be eligible for early release or placement in a halfway house six months prior to his release date, and therefore will have to serve more time than other federal prisoners under the exact same sentence.

The Bureau of Prisons discriminates–albeit lawfully–against deportable aliens in a number of different aspects.  The rules and regulations providing for differential treatment for aliens that increase both the length and the severity of their confinement include, but are not limited to, the following:

• **Halfway House.**  Deportable aliens are not eligible for early placement into a halfway house and must serve the entire length of their sentences, less good time credit.  See, e.g., TRIAD Drug Treatment Evaluation Program  at 70 ("An inmate will most likely be

determined *ineligible* for a CCC placement if he or she meets any of the following

conditions:  is a deportable alien") (emphasis added).

- **More Severe Inmate Classification.**  Deportable aliens are not eligible for placement

  into a prison camp.

- **Ineligibility for Federal Prison Industries.**  Under 28 C.F.R. § 345.35, deportable

  aliens are not eligible to work while in prison in the Federal Prison Industries Program

  ("FPI").  ("An inmate or detainee may be considered for assignment with FPI unless the

  inmate is... currently under an order of deportation, exclusion, or removal").

- **Ineligibility for Early Release for Completion of Drug Treatment Program.**  Under

  28 C.F.R. § 550.55(b)(1), deportable aliens are not eligible for early release for successful

  completion of the residential drug treatment program.

- **Ineligibility for Vocational Training.**  Deportable aliens are frequently if not always

  ineligible for vocational training.  See, e.g., Admission & Orientation Inmate Handbook,

  FCI Schuylkill at 15 ("Inmates who have a verified High School Diploma or GED

  certificate and are not deportable aliens, have the opportunity to develop a marketable

  skill in the areas of Carpentry and Horticulture")

- **Ineligibility for Regional Designation.**  Deportable aliens are not designated to an

  institution close to where they, their families and friends live.  See, e.g., Admission &

  Orientation Inmate Handbook, FCI Texarkana at 12 ("Inmates who are citizens of other

countries and have been ordered deported are not ordinarily eligible for transfers [to an institution within 500 miles of home] and will remain at this facility for service of their sentence").

Mr. Seng's status as a deportable alien therefore will increase both the severity and the length of his sentence. As a result, the Court should reduce Mr. Seng's offense level prior to considering the other section 3553 factors as they apply in this case.

For the forgoing reasons, pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a) and in light of sentencing factors set forth in 18 U.S.C. §3553(a) as delineated in <u>Rita v. United States</u>, 127 S. Ct. 2456 (2007), <u>Kimbrough v. United States</u>, 128 S. Ct. 558 (2007) and <u>Gall v. United States</u>, 128 S. Ct. 586 (2007), Mr. Seng respectfully submits that the requested sentence of "time served" is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


/s/

_____
DAVID W. BOS
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, DC  20004
(202) 208-7500

18