**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.   10-174 (EGS)** |
| | : | |
| **v.** | : | |
| | : | |
| **LIM KOW SENG (a/k/a "Eric Lim,"** | : | |
| **a/k/a "James Wong"),** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### Introduction

Defendant Lim Kow Seng has pled guilty to one count of Conspiracy to Defraud the United States by Dishonest Means, in violation of 18 U.S.C. § 371, arising out of his trafficking in military-grade antennas.  This is the sole charge for which defendant was extradited by the government of Singapore.  Between 2006 and 2007, the defendant orchestrated an export shipment worth over $80,000, in violation of U.S. export controls.  Such activities are egregious and implicate both the national security and the foreign policy of the United States. Defendant Lim's offenses are serious and warrant a significant sentence.

The Probation Office has determined – and the parties agree – that the defendant's Guideline offense level is 26 and that his Criminal History Category is I, thus making the appropriate sentencing range 63 to 78 months.  One of the conditions of the defendant's plea agreement was, however, that should he accept responsibility for his actions prior to sentencing, the government would agree to a 3-level reduction pursuant to U.S.S.G. § 3E.1(a).  The defendant has satisfactorily demonstrated that he accepts responsibility and saved the government and the Court time and resources by pleading guilty in a timely fashion.  The

1

government believes the § 3E1.1(a) reduction is appropriate.  Consequently, the applicable adjusted offense level is 23, with an appropriate sentencing range of 46 to 57 months.

For the reasons outlined below, the government is recommending that the Court sentence defendant Lim to 57 months of incarceration.  Such a sentence fully comports with the factors set forth in 18 U.S.C. § 3553(a).  It accounts for the seriousness of the crime.  It would also serve as a real deterrent against others in defendant's position who might think of taking advantage of open global trade to divert controlled products to illegal destinations.  Furthermore, it would promote respect for this nation's export laws and national security controls, and it would be consistent with the sentences that other defendants have received for similar criminal conduct.

### Legal Framework

Defendant Lim conspired to violate a strategically critical export control regime – the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 et seq., and the related restrictions that the Department of State enforces through the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120–130.  The ITAR specifically governs the export of "defense articles" and also contains the United States Munitions List ("USML"), 22 C.F.R. § 121.1, which designates what items are "defense articles."  "Defense articles," as that term is used in 22 U.S.C. § 2778(b)(2) and the ITAR, means items, including technical data, designated for placement on the USML as weapons, weapons systems, munitions, aircraft, associated equipment, and other implements of war.  The United States government does not grant USML designation lightly.  The Executive Branch draws on its unique and prodigious informational resources to determine what products hold such an essential position in the constellation of American military prowess that their unregulated distribution cuts into this nation's defenses. Numerous courts have recognized that ITAR violations therefore evince a dangerous irreverence

for security policy, regardless of the character of the underlying goods.   See, e.g., United States v. Hanna, 661 F.3d 271 (6th Cir. 2011) ("any violation of the embargo is necessarily an offense that 'involves' national security") (internal quotations omitted); United States v. Min, 2000 WL 1576890, at *2 (S.D.N.Y. 2000) ("The nature of the goods, innocuous or other, is not controlling.").  Treating ITAR violations leniently permits criminals to operate with cavalier disregard for the legal framework supporting the safety of this country.


**Factual Background**

The antennas which the defendant illegally exported represent precisely the kind of high technology intended to be controlled by the ITAR.  A senior engineer and a senior analyst at the Defense Technology Security Administration ("DTSA") were interviewed regarding these antennas.  According to them, the 2010-1 Cavity-Backed Spiral Antenna has an extremely wide bandwidth for a small antenna.  The U.S. military uses these antennas on fighter jets and almost every other aircraft.  The 2010-1 antenna is an electronic warfare tool used to detect enemy radar and missiles.  The 3120 Biconical Antenna is installed into ships and used to detect anti-aircraft, anti-missile, radars, and other weapons systems.  The 3120 antenna will show "where the shooters are in the heat of a battle," resulting in close-range protection for naval ships, fighters, and troops.  According to the DTSA officials, these "antennas would give the enemy a chance" to better, and more quickly, detect U.S. forces and would take away the U.S. advantage on the battlefield.

Simply put, these antennas serve military purposes.  The laws that the defendant broke ensure that our government remained aware of which foreign nations possessed the capability

bestowed by the hardware.  Defendant's acts could very well have endangered the lives of American and allied pilots.

It is important to note that one of the defendants' co-conspirators was Amin Ravan, an Iranian national, who was illegally procuring the antennas for use in Iran.  Ravan is the subject of a criminal indictment returned by a grand jury empaneled in the District of Columbia (Crim. No. 11-00334 (EGS)).  That indictment is based on the same operative facts supporting the guilty pleas of defendants Hia and Lim.  The email communications between Ravan and defendants Hia and Lim make it clear that they fully understood that they were procuring items destined for Iran.  Proliferation procurement networks permit rogue states to circumvent international opprobrium by relying on criminal conspiracies like defendant's to obtain restricted items.  The Executive Branch of the United States has determined as a matter of foreign and national security policy that the threat posed by the government of Iran is so severe that a complete trade embargo is necessary to protect the interests of the United States.  Congress has acted in kind, recognizing repeatedly the threat posed by Iran.  See Iran Freedom Support Act, PL 109-293 (HR 6198) September 30, 2006; see also Iran Sanctions, Accountability, and Divestment Act of 2010, P.L. 111-195 (HR 2194) July 1, 2010.

Defendant Lim was motivated solely by greed.  The primary goal of the export scheme was to supply USML-designated items to Ravan, in Iran.  As outlined in the Statement of Facts Supporting Guilty Pleas, Corezing International Pte Ltd ("Corezing") was a trading company based in Singapore.  Corezing was led by a two-person team - namely, defendants Lim and Hia. They were directly involved in the transactions.  They personally stood to gain from the transactions.  Through his own actions, the actions of his co-conspirators for which he is liable, and those of his company, Corezing, defendant Lim shipped fifty-five USML-designated model

2010-1 and 3120 antennas to Asia (knowing full well that the ultimate destination was Iran) in violation of U.S. export law.  The shipments' combined value was approximately $81,950.  The defendant purposely evaded U.S. law and never applied for the required licenses from the Directorate of Defense Trade Controls ("DDTC") within the Department of State.  Furthermore, the defendant and his co-conspirators systematically made discrete efforts to evade United States export law.  Defendants failed to provide required end-user certifications requested by the U.S.-based manufacturer.  Defendants caused the antenna frequencies for the order to be altered so as to circumvent the manufacturer's internal export compliance controls, thereby avoiding scrutiny of the illegal activity.

It is worth noting that defendant Lim was involved in this transaction from the very beginning.  He made multiple attempts to procure these antennas until he was ultimately successful.  He used a variety of aliases to disguise his identity.  He negotiated the terms of the deal.  He specifically cautioned Ravan against using an Iranian bank ("Is OK for me what currency.  Just ensure that payment is not from any Iran bank.") in order to avoid detection by law enforcement authorities.  He offered to ship the antennas from Singapore to Iran.  Such behavior demonstrates disregard for United States laws safeguarding American security by controlling the flow of strategically sensitive military hardware into the global stream of commerce.

## Argument

### I.      Legal Standards

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court ruled that the Guidelines are no longer mandatory.  However, in the remedy portion of the opinion, the Court

also made it clear that, in determining the appropriate sentence for a defendant, the district court judge must calculate and consider the applicable Guidelines range, refer to the pertinent Sentencing Commission policy statements, and bear in mind the need to avoid unwarranted sentencing disparities.  Although the judge must also weigh the factors enunciated in 18 U.S.C. § 3553(a), "it is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice to be consulted or overlooked at the whim of a sentencing judge."  United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).  As one member of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence."  United States v. Doe, 413 F. Supp. 2d 87, 90 (D.D.C. 2006) (Bates, J.). The Fourth Circuit also addressed the proper method of analysis by a trial court, writing:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.  Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

After Booker, in resolving issues under the Guidelines, the Court continues to use a preponderance of the evidence standard, and consideration of acquitted or uncharged conduct remains appropriate.  United States v. Dorcely, 454 F.3d 366, 372 (D.C. Cir.), cert. denied, 127 S. Ct. 691 (2006); see also In re Fashina, 486 F.3d 1300, 1305 (D.C. Cir. 2007) (preponderance of the evidence standard).

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6)

effectively provide the defendant with needed educational or vocational training and medical care.  See 18 U.S.C. § 3553(a)(1) and (2).  In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

II.      **An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that a Significant Period of Incarceration Is Appropriate**

A.      **The Nature and Circumstances of the Offense**

Putting sophisticated U.S. technology in the hands of foreign entities to which exports are restricted for proliferation reasons poses a threat to the national security.  The Sentencing Commission has reflected the seriousness of the violations here by assigning a high base offense level to all export crimes that implicate national security and non-proliferation interests and by not differentiating among those crimes according to the nature of the goods involved.  The defendant's crime was serious and involved much planning and deceit.  The offense was hardly the careless error of a harried import/export merchant.  It was the deliberate choice of a shrewd, competent international businessman who prioritized his own financial well-being over all else.  The defendant's acts undermined the legitimacy of America's security apparatus.  The sentence that the government is recommending is therefore necessary to emphasize the importance of export controls in contributing to the national defense.

B.      **The History and Characteristics of the Offender**

Defendant Lim is typical of many white-collar offenders.  He is highly educated, diligent, and ambitious.  In light of those qualities, the ease with which he succumbed to temptation and put personal interests ahead of respect for the law is hard to fathom.  The defendant's incarceration has been, and will certainly continue to be, a hardship to his family.  The

government has sympathy for them.  There is, however, nothing that indicates that the burden on the family of this offender will be any different from the burden the family of any white collar offenders bears or the burden on the family of a violent criminal.

In short, the defendant's personal history and family situation do not provide uniquely mitigating circumstances.

### C.      The Need To Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and To Protect the Public

Deterrence and promoting respect for the law should be the principal goal of the Court's sentence here.  Sentences in white-collar cases, arguably more so than in any other area in criminal law, can have a real deterrent effect.  A strong sentence will serve as a true warning to anyone tempted to ignore the export laws.  Export laws deserve the utmost respect thanks to the crucial role they play in preserving international order, and this defendant should not be permitted to flaunt them and encourage others to do the same.  Through its punishment of defendant Hia in this case, the Court can send the message that export violations, particularly those with national security implications, are – as Congress, the President, and the Guidelines intended them to be – grave matters that warrant real punishment.

### D.      The Need To Provide the Defendant with Educational or Vocational Training

The defendant does not need such training.  In any event, the other factors bearing on the seriousness of the offenses and the need for strong deterrence outweigh this element in fashioning a just sentence.

**E.     The Need To Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of <u>Similar Conduct</u>**

The starting point in the Court's analysis under § 3553(a)(6) is the sentences of "defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  In the instant case, defendant Lim was trafficking in military equipment which he knew was destined for Iran.

A comparison of the government's recommended sentence for defendant Lim with the sentences in other prosecutions underscores the reasonableness of the 57-month sentence that the government proposes.  While there are not many cases that involve <u>only</u> a conspiracy to violate the AECA, there are a number of matters which address conduct very similar to that of Lim and Hia.  In <u>United States v. Michael Edward Todd</u>, 05:10-cr-0058-1 (M.D. Ga.), the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate the International Emergency Economic Powers Act ("IEEPA") and the AECA for exporting military aircraft equipment to Iran, and was sentenced to 35 months' imprisonment.  The 35-month sentence took into account the defendant's substantial assistance in the lure and arrest of a co-defendant.  Michael Todd's co-defendant, who also assisted in the lure and arrest of an Iranian procurement agent, was sentenced to 56 months' imprisonment.  <u>See</u> <u>United States v. Hamid Seifi</u>, 05:10-cr-0058-3 (M.D. Ga).

There are many more cases which involve conspiring to violate the IEEPA (as opposed to the AECA) in an embargo context, including a very recent matter from the District of Columbia.  In August of 2013, the Honorable Richard J. Leon, United States District Court Judge for the District of Columbia, sentenced a defendant, Arsalan Shemirani, to 48 months' imprisonment in an export case (<u>United States  v. Shemirani</u>, Crim. No. 12-CR-0075 (RJL)).  Shemirani had

entered a cooperation plea agreement in which he pled guilty to one count of conspiring under 18 U.S.C. § 371 to violate the IEEPA. Shemirani had conspired to purchase U.S.-origin products from U.S. suppliers and to export or cause the export of those products from the U.S. to Iran via Canada and Hong Kong. Unlike the instant case, none of the exports involved military items. Shemirani's guideline imprisonment range was 46 to 57 months. The government moved for a downward departure pursuant to § 5K1.1 of the Guidelines due to the substantial assistance the defendant provided under the plea agreement. Judge Leon sentenced Shemirani to 48 months' imprisonment.

Other examples of sentences in embargo cases include United States v. Mohammad Reza Haijan, 08:12-cr-00177 (M.D. Fla.). There, the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate IEEPA for exporting computers and computer related equipment to Iran, and was sentenced to 48 months' incarceration. In United States v. Laura Wang-Woodford, 03-cr-0070 (E.D.N.Y.), the defendant pleaded guilty to one count of conspiring to violate IEEPA for her involvement in shipping aircraft component parts to Iran through other countries, and was sentenced to 46 months' incarceration, which was the upper range of the stipulated 37 to 46 months contained in the parties' plea agreement. See also United States v. David McKeeve, 131 F.3d 1 (1st Cir. 1997) (51-month sentence in an IEEPA prosecution for sending computer products to Libya in violation of embargo).[1]

### III.    A Downward Departure Is Not Warranted Under United States v. Smith

The defense suggests that a downward departure under the D.C. Circuit's decision in United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994) to account for any severe aspects of

---

[1] Significantly, McKeeve used the pre-2001 version of § 2M5.1(a)(1) and § 2M5.2(a)(1), which had a base offense level of 22. The sentences would undoubtedly be higher today, with the higher base offense level of 26.

defendant Lim's conditions of confinement that are a result of his status as a deportable alien might be warranted.  Defendant's Memorandum in Aid of Sentencing at 16-18.  Under <u>Smith</u>, however, a defendant must demonstrate that he would necessarily and in fact be subject to substantially more severe conditions for a substantial period of his sentence than he would if he were not subject to deportation.  27 F.3d at 655.  As stated in <u>Smith</u>, any departure, including one based on deportability, should be granted only when the greater severity is undeserved, solely on account of his alienage, and should be "highly infrequent."  <u>Id.</u>  There is no evidence that this defendant will suffer more severe conditions of incarceration for a substantial part of his sentence simply because of his status as a deportable alien.  And even if there were some indication that his conditions would be more severe, "a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved."  <u>Id.</u> at 655.  In this case, defendant Lim is deserving of substantial punishment.  For these reasons, this Court should thus decline to impose a downward departure based on <u>United States v. Smith</u>.

**Conclusion**

For the foregoing reasons, the Court should sentence defendant Lim to 57 months of

incarceration.

Respectfully submitted,

RONALD C. MACHEN, JR.
UNITED STATES ATTORNEY
D.C. Bar No. 415793


By:      _____/s/_____
Anthony Asuncion
Assistant United States Attorney
D.C. Bar No. 420822
anthony.asuncion@usdoj.gov
National Security Section
555 4th Street, NW – 11th Floor
Washington, D.C.  20530
(202) 252-7786


_____/s/_____
Richard S. Scott
Trial Attorney
Counterespionage Section
D.C. Bar No. 502455
richard.s.scott@usdoj.gov
600 E Street NW – 10th Floor
Washington, D.C.  20004
(202) 233-2263

**<u>Certificate of Service</u>**

I, Richard S. Scott, certify that I caused to be served a copy of the foregoing

Government's Sentencing Memorandum by electronic means on counsel of record for defendant

Lim this 13th day of September, 2013.

_____/s/_____

Richard S. Scott
Trial Attorney